## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE OF FLORIDA
ORLANDO DIVISION

Case No.: _____

|  |  |
|---|---|
| WYNDHAM VACATION OWNERSHIP, INC. a Delaware corporation; WYNDHAM VACATION RESORTS, INC., a Delaware corporation, WYNDHAM RESORT DEVELOPMENT CORPORATION; an Oregon Corporation, SHELL VACATIONS, LLC, an Arizona limited liability company; SVC-WEST, LLC, a California limited liability company; SVC-AMERICANA, LLC, an Arizona limited liability company; and SVC-HAWAII, LLC, a Hawaii limited liability company, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| REED HEIN & ASSOCIATES, LLC d/b/a TIMESHARE EXIT TEAM, a Washington limited liability company; BRANDON REED, an individual and citizen of the State of Washington; TREVOR HEIN, an individual and citizen of Canada; THOMAS PARENTEAU, an individual and citizen of the State of Washington; HAPPY HOUR MEDIA GROUP, LLC, a Washington limited liability company; MITCHELL R. SUSSMAN, ESQ. d/b/a THE LAW OFFICES OF MITCHELL REED SUSSMAN & ASSOCIATES, an individual and citizen of the State of California; SCHROETER, GOLDMARK & BENDER, P.S., a Washington professional services corporation; and KEN B. PRIVETT, ESQ., a citizen of the State of Oklahoma, | |
| Defendants. | |

Plaintiffs Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts,

Inc. ("WVR"); Wyndham Resort Development Corporation ("WRDC"); Shell Vacations, LLC

("SV"); SVC-West, LLC ("SVC-West"); SVC-Americana, LLC ("SVC-Americana"); and SVC-

Hawaii, LLC ("SVC-Hawaii") (collectively, "Wyndham"), through counsel and pursuant to the Federal Rules of Civil Procedure, hereby sue Defendants Reed Hein & Associates, LLC d/b/a Timeshare Exit Team ("TET"); Brandon Reed ("Reed"), Trevor Hein ("Hein"), Thomas Parenteau ("Parenteau"), Happy Hour Media Group, LLC ("Happy Hour"), Mitchell R. Sussman, Esq. d/b/a The Law Offices of Mitchell Reed Sussman & Associates ("Sussman"), Schroeter, Goldmark & Bender, P.S. ("SGB"), and Ken B. Privett, Esq. ("Privett") (collectively, the "Defendants"), and state:

A.   **INTRODUCTION**

1.      This action is based on the simple premise that it is inherently false and misleading for a non-party to a contract to advertise and sell a "guaranteed" ability, backed by a "100%" "money-back", policy to cancel or release a party to a binding contract of that party's contractual obligations when there is no such ability.  In other words, a party cannot make false or misleading advertisements about its own products and/or services.  *See Pom Wonderful, LLC v. Coca-Cola Co.* 573 U.S. 102 (2014); *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

2.      Wyndham develops vacation properties.  Wyndham, as developer, can divide a single vacation unit between 52 owners, with each owner purchasing a fractional interest of the whole for a specified share of the total price, i.e. deeded ownership.  Developers, like Wyndham, also sell membership interests to consumers in the form of points, which are exchanged for use at Wyndham properties.  Wyndham owners may also belong to an exchange program, which allows owners to use their ownership at Wyndham resorts to stay at additional properties that Wyndham does not own, further expanding consumer's choices.

3.      Thus, consumers enjoy regular vacations for a fraction of the typical cost and without the burdens associated with undivided vacation property ownership (such as being solely

responsible for taxes, maintenance, and repairs).  Moreover, in exchange for payment of a regular maintenance fee, timeshare owners receive assurance of high quality resorts every year.

4.      Timeshare ownership is a contractual relationship.   Wyndham has valid and binding contracts (the "Timeshare Contracts") with identifiable individuals who purchased timeshare interests from Wyndham (the "Wyndham Owners").  The Timeshare Contracts control the benefits and obligations of timeshare ownership between the Wyndham Owners and Wyndham.

5.      Defendants are not parties to the Timeshare Contracts.  Yet, they falsely and misleadingly advertise, or benefit, at least in part, from said advertising, a "cancellation" or "exit" service that purports to "guarantee" a "safe" and "legitimate" termination of the Timeshare Contracts.  The following is an example of an advertisement run by TET:



This advertisement is false and/or misleading because neither TET, nor any of the other Defendants, have any "safe", "legitimate", or "guaranteed" means of 'exiting' any timeshare owner (including Wyndham Owners) from their timeshare contracts (including the Timeshare Contracts).  Moreover, this advertisement is false and/or misleading because the "100% Money Back Guarantee" is illusory as TET (and the other Defendants) consider *any* offer from a timeshare developer  – even a demand to accelerate all amounts to come due and owing pursuant to the timeshare contract – to have satisfied TET's obligations to the consumer.

- 3 -

6.      Moreover, because a promise or guarantee of this nature would violate the Florida Rules of Professional Conduct if advertised directly by lawyers or a law firm, such as Defendants Sussman, SGB, and Privett,[1] the non-lawyer Defendants (TET, Reed, Hein, Parenteau, and Happy Hour) publish, or cause to be published, thousands upon thousands of advertisements, including the one shown in Paragraph 5 *supra*, and then refer any "clients" to Sussman, SGB, or Privett for purported legal representation.   A chart showing the inter-relatedness of the Defendants is annexed hereto as Exhibit 1.

7.      Sussman, SGB, and Privett each have retainer agreements directly with TET, *not* with any of the "clients" solicited by the non-lawyer defendants (TET, Reed, and Hein). Pursuant to these bulk retainer agreements, TET promises to pay Sussman, SGB, and Privett each a fixed fee and send a minimum guaranteed number of files to the lawyers per month.

8.      Sussman, SGB, and Privett are directed to have no contact with any of TET's clients (many of whom are Wyndham Owners), while those clients are also directed to have no contact with Sussman, SGB, and Privett.   Many Wyndham Owners who have become TET's clients are unaware of the very existence of Sussman, SGB, and Privett.

9.      Through false and misleading advertisements, Defendants deceive hundreds of Wyndham Owners into knowingly or unknowingly paying Defendants, including the attorney-defendants (Sussman, SGB, and Privett), at substantial cost (always in the thousands of dollars, sometimes tens-of-thousands of dollars) to implement Defendants' purported "cancellation" or "transfer" services related to their Timeshare Contracts.

---

[1] Rule 4-7.13(b), Florida Rules of Professional Conduct, states, "Deceptive or inherently misleading advertisements include, but are not limited to advertisements that contain: (1) statements or information that can reasonably be interpreted by a prospective client as a prediction or guaranty of success or specific results; . . . ."

10.    The "services" Defendants sell typically result in an outcome very different than what Defendants promise.  As opposed to obtaining a release, novation, or other legal remedy, TET representatives have expressly stated that TET's business plan is to "break" the Timeshare Contracts.  Neither TET nor any of the other Defendants ever inform Wyndham Owners of TET's true plan.

11.    TET – which is not a law firm – is not providing assistance to Wyndham Owners in situations where Wyndham has done something illegal.  As shown by TET's "Frequently Asked Questions" section on its website (and many of TET's other advertisements), TET solicits and targets timeshare owners (including Wyndham Owners) who want to terminate their contracts (including Timeshare Contracts) for any reason or no reason at all, including simply not wanting it anymore.

12.    Upon being retained, TET instructs, deceives, induces, or persuades Wyndham Owners to stop fulfilling their contractual obligations under the Timeshare Contracts, telling Wyndham Owners that so doing will facilitate the "exit," "cancellation", or "transfer."  In fact, Defendants' frequently promise that very ability to cease making payments on the Timeshare Contracts.   For example, when advertising that their fees are more affordable for consumers over the long term, TET states "[l]et's say Jack's exit process will necessitate the equivalent of 3-5 years of maintenance fees" and then states "Jack could pay full price over 15 years or save 10-12 years worth of expenses by wiping his hands of the whole thing with the one-time exit fee."[2]  Thus, TET attempts to justify its fees (and, by extension, the fees it pays to Sussman, SGB, and Privett) by informing consumers that they will be able to immediately cease making payments to timeshare developers. These statements are made by TET as part of their standard

---

[2] https://timeshareexitteam.com/is-exiting-a-timeshare-expensive/#more-2084 (last accessed Oct. 29, 2018).

operating procedures and are part of the overall 'script' TET utilizes when attempting to sell consumers on utilizing TET's illusory services.

13.     Defendants do not disclose to the Wyndham Owners the consequences of ceasing payments, or that their "cancellation" and "exit" will actually result in an unlawful breach of the Timeshare Contracts due to non-payment, leading to foreclosure of their timeshare interests and other adverse consequences.

14.     Sussman has admitted that foreclosure of a consumer's timeshare interest is one of the "exit" methods utilized by Sussman as part of his work for TET:

```
6. Pursuant to the terms of the retainer agreement I provided
   proprietary information, legal and consulting services to TET
   in connection with their desire to secure the liquidation and
   return of TET's customer's timeshares.

7. Under my retainer with TET I have consulted with and guided
   TET and its customers through the maze of take back
   procedures that timeshares utilize.
```

```
9. These take back procedures take different forms, ranging from
   mutual settlement agreements, letters confirming
   cancellation, deed backs and foreclosure proceedings in which
   the timeshare developer takes back the timeshare in
   satisfaction of the debt through in rem procedures.  Such
   procedures are not only confusing but to most lay persons
```

Declaration of Mitchell R. Sussman, *Orange Lake Country Club, Inc. et al. v. Reed Hein & Associates, LLC et al,* Case No. 17-cv-01542-RBD-KRS, pending in the United States District Court for the Middle District of Florida, ECF No. 197-1.

15.     Defendants SGB and Privett utilize similar 'strategies' in their work for TET.

16.     The three primary deceptive and unlawful strategies employed by Sussman, SGB, and Privett are:

> i.      The "Resignation": where the attorney-defendants (Sussman, SGB, Privett) send a letter simply 'notifying' Wyndham that the Wyndham Owner has 'resigned' from the Timeshare Contract;
>
> ii.     The "Deed Back": where the attorney-defendants (Sussman, SGB, Privett) have the Wyndham Owner execute a quitclaim deed purporting to quitclaim the Wyndham Owner's timeshare interest back to Wyndham, even though Wyndham lacked mutual interest in taking back the timeshare interest (and Defendants knew of this lack of mutual interest); and
>
> iii.    The "Strawman": where the Wyndham Owner's timeshare interest is transferred to a strawman buyer – who lacks any intent or ability[3] to pay – and without the knowledge and consent of Wyndham.

17.     In all of the foregoing schemes, or after the Timeshare Contracts are foreclosed, Defendants then misrepresent to the now-former Wyndham Owners that they were successful in "cancelling" or "exiting" their Timeshare Contracts, even though all Defendants know this is not the case.

---

[3] Sussman has testified that he pays these individuals $100 for each deed and that many of them are desperate (indeed, Sussman believes he is doing these individuals a 'favor' by paying them $100 to take on a contractual obligation they cannot afford).

18.     The lawyer-defendants (Sussman, SGB, Privett) perform no actual work or negotiations on behalf of the Wyndham Owners that have paid TET, simply sending form demand letters and failing to undertake any other actions.  All three profit handsomely from this activity – each was being paid by TET $1,200 per file with a guaranteed minimum of 800 files per month.  SGB's current fee amounts to more than $3,000,000.00 per year.

19.     TET, Reed, Hein, and Parenteau all know that the foregoing 'methods' of 'exiting' a timeshare contract are unlawful, invalid, and illegal; they simply do not care.  In fact, after a TET attorney erroneously sent thousands of letters to TET customers stating that their timeshares had been 'exited', Reed, Hein, and Parenteau elected not to tell the customers the truth and, instead, the three specifically instructed TET employees to conceal this information.

20.     A cancellation or rescission of a contract is very different in nature than a breach and termination.  But Defendants advertise the former only to mislead Wyndham Owners into the latter.

21.     What is worse, each Wyndham Owner pays Defendants thousands of dollars to breach a Timeshare Contract that the Wyndham Owner could have breached on his or her own, for free.  Defendants' "cancellation" services are therefore illusory, and the Wyndham Owners often do not realize the scam until after the damage is done when their credit rating is badly hurt due to the foreclosure.

22.     Under the Florida Statutes, the "cancellation" of a Timeshare Contract is a specific, non-waivable rescission right held by Wyndham Owners that can be exercised within a certain time period following the execution of a Timeshare Contract.  *See* Fla. Stat. § 721.10.  It is not a service that can be advertised, sold, or provided in commerce.

23.     Defendants mislead Wyndham Owners into purchasing illusory "cancellation" or "transfer" services and thereby cause and induce the breaches of hundreds of Timeshare Contracts.

24.     Moreover, TET's "100% guarantee" is illusory as TET considers foreclosure or payment in full – results that any Wyndham Owner could accomplish on their own and without the burden of the substantial payment to TET (which is divvied up by the Defendants for themselves) to be 'exits' that satisfy the guarantee such that no refund is owed.

25.     All that Defendants actually accomplish is misleading Wyndham Owners and interfering in the routine relationship and communication between Wyndham and the Wyndham Owners, causing significant harm to both.

26.     Defendants are aware that these practices are unlawful and invalid, but continue their actions unabated, carrying them out as part of their common conspiracy, causing significant harm to both Wyndham and the Wyndham Owners.

27.     Wyndham has no other option but to actively and aggressively seek damages and injunctive relief to thwart Defendants from inflicting further damage to Wyndham's business and, most importantly, to its relationships with Wyndham Owners.

**B.     OVERVIEW OF THE COMPLAINT**

28.     In pursuing its legal and equitable remedies here, Wyndham is vindicating its own rights in response to the ongoing damage being done to it by Defendants, which has culminated in millions of dollars of lost revenue. Wyndham is also protecting from further harm the Wyndham Owners, and timeshare owners at large, who have been scammed and negatively impacted by Defendants' wrongful conduct.

29.     This Complaint requests damages and injunctive relief for false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), intentional interference with contractual

relations, civil conspiracy to commit tortious interference, and violations of the Florida Deceptive and Unfair Trade Practices Act.

C.     **PARTIES, JURISDICTION, AND VENUE**

     i.     **The Plaintiffs**

30.     Plaintiff Wyndham Vacation Ownership, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

31.     Plaintiff Wyndham Vacation Resorts, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

32.     Plaintiff Wyndham Resort Development Corporation is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

33.     Plaintiff Shell Vacations LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

34.     Plaintiff SVC-West, LLC is a limited liability company organized and existing under the laws of the state of California with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

35.     Plaintiff SVC-Americana, LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

36.     Plaintiff SVC-Hawaii, LLC is a limited liability company organized and existing under the laws of the state of Hawaii with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

ii.     **The Defendants**

37.     Defendant Reed Hein & Associates, LLC d/b/a Timeshare Exit Team ("TET") is a limited liability company organized and existing under the laws of the state of Washington. TET was formed on or about December 31, 2012.

38.     TET claims on its website – www.timeshareexitteam.com – to have over 30 local offices or locations around the United States and Canada,[4] but its principal address is 3400 188th Street SW, Suite 300, Lynwood, Washington 98037.   A copy of the relevant record from the Florida Secretary of State is attached hereto as Exhibit 2.

39.     TET has two "Governing Persons": Brandon Reed and Trevor Hein.  A copy of the relevant record from the Washington Secretary of State is attached hereto as Exhibit 3.

40.     Defendant Brandon Reed is an individual domiciled in King County, Washington and is a citizen of the state of Washington, and is otherwise *sui juris*.  Reed is personally liable for the actions of TET for at least the following reasons:

     a.     Reed is one of the founding members (along with Hein) of TET and currently serves as TET's Chief Executive Officer;

     b.     he serves as a driving, integral figure in TET's schemes described in this Complaint;

     c.     he, along with co-defendants Hein and Parenteau, directs and controls TET, which he formed (along with Hein and Parenteau) and have used for

---

[4] https://timeshareexitteam.com/about-us/ (last accessed Oct. 29, 2018).

the improper purpose of operating a fraudulent timeshare exit scheme, and because TET is the alter ego of the three;

d. he uses TET as a mere instrumentality or business conduit to perpetrate a fraud on Wyndham Owners that results in significant harm to Wyndham; he dominates TET to such an extent that it has no independent existence apart from his own (together with Hein and Parenteau);

e. more specifically, Reed instructs his employees to delay and confuse customers about the status of their files to avoid having to make payments under the guarantees, all while taking millions of dollars out of the company for his own, personal gain;

f. he uses TET in an attempt to conceal his identity as an orchestrator of a fraudulent scheme directed at Wyndham (and others) such that the corporate form of TET must be disregarded and individual liability imposed on Reed to prevent further losses to Wyndham; and

g. he is one of the three masterminds (together with Hein and Parenteau) behind TET's (and the other Defendants') overall scheme and directs and controls all of TET's activities which are the subject of this lawsuit.

41. Defendant Trevor Hein is an individual domiciled in Surrey, British Columbia, Canada and is a citizen of Canada, and is otherwise *sui juris*. Hein is personally liable for the actions of TET for at least the following reasons:

a. Hein is one of the founding members (along with Reed) of TET;

b. he serves as a driving, integral figure in TET's schemes described in this Complaint;

- 12 -

c. he, along with co-defendants Reed and Parenteau, directs and controls TET, which he formed (along with Reed and Parenteau) and have used for the improper purpose of operating a fraudulent timeshare exit scheme, and because TET is the alter ego of the three;

d. he uses TET as a mere instrumentality or business conduit to perpetrate a fraud on Wyndham Owners that results in significant harm to Wyndham; he dominates TET to such an extent that it has no independent existence apart from his own (together with Reed and Parenteau);

e. more specifically, Hein instructs his employees to delay and confuse customers about the status of their files to avoid having to make payments under the guarantees, all while taking millions of dollars out of the company for his own, personal gain;

f. he uses TET in an attempt to conceal his identity as an orchestrator of a fraudulent scheme directed at Wyndham (and others) such that the corporate form of TET must be disregarded and individual liability imposed on Reed to prevent further losses to Wyndham; and

g. he is one of the three masterminds (together with Reed and Parenteau) behind TET's (and the other Defendants') overall scheme and directs and controls all of TET's activities which are the subject of this lawsuit.

42. Defendant Thomas Parenteau is an individual domiciled in King County, Washington and is a citizen of the state of Washington, and is otherwise *sui juris*. Parenteau is personally liable for the actions of TET for at least the following reasons:

a. Parenteau currently serves as TET's Chief Operating Officer;

b.      he serves as a driving, integral figure in TET's schemes described in this Complaint;

c.      he, along with co-defendants Reed and Hein, directs and controls TET, which he has used for the improper purpose of operating a fraudulent timeshare exit scheme, and because TET is the alter ego of the three;

d.      he uses TET as a mere instrumentality or business conduit to perpetrate a fraud on Wyndham Owners that results in significant harm to Wyndham; he dominates TET to such an extent that it has no independent existence apart from his own (together with Reed and Hein);

e.      more specifically, Parenteau instructs his employees to delay and confuse customers about the status of their files to avoid having to make payments under the guarantees, all while taking millions of dollars out of the company for his own, personal gain;

f.      he uses TET in an attempt to conceal his identity as an orchestrator of a fraudulent scheme directed at Wyndham (and others) such that the corporate form of TET must be disregarded and individual liability imposed on Reed to prevent further losses to Wyndham; and

g.      he is one of the three masterminds (together with Reed and Hein) behind TET's (and the other Defendants') overall scheme and directs and controls all of TET's activities which are the subject of this lawsuit.

43.     Defendant Happy Hour Media Group is a limited liability company organized and existing under the laws of the State of Washington and is co-located with TET.  In fact, Happy

Hour Media Group was formed by Reed and Hein to act as the in-house marketing agency for TET.

44.     Defendant Mitchell R. Sussman, Esq. d/b/a The Law Offices of Mitchell Reed Sussman & Associates is an individual and an attorney licensed to practice law in the State of California who maintains a business office at 1053 South Palm Canyon Drive, Palm Springs, California 92264, and is otherwise *sui juris*.

45.     Defendant Schroeter, Goldmark & Bender, P.S. is a professional services corporation organized and existing under the laws of the State of Washington with a business office at 810 Third Avenue, Suite 500, Seattle, Washington 98104, and is otherwise *sui juris*.  A copy of the relevant record from the Washington Secretary of State is attached hereto as Exhibit 4.

46.     Defendant Ken B. Privett, Esq.  is an individual and an attorney licensed to practice law in the State of Oklahoma who maintains a business office at 524 5th Street, Pawnee, Oklahoma 74058, and is otherwise *sui juris*.

### iii.     Subject Matter Jurisdiction

47.     This Court has subject matter jurisdiction over the claims sounding in the Lanham Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

### iv.     Personal Jurisdiction

48.     This Court may exercise personal jurisdiction over Defendants because this action arises out of and is related to Defendants' purposeful contacts with the State of Florida, including (i) the solicitation of Florida owners through the use of false and deceptive advertising, (ii) the

intentional interference with contracts between Plaintiffs, whose principal place of business is located in Florida, and Florida residents, and (iii) the intentional interference with advantageous business and contractual relationships between Plaintiffs and Florida residents.  Specifically, Defendants solicited, via postings on various websites, national television endorsements, radio advertising, and other advertising, Wyndham Owners (as that term is defined herein below) who are also Florida residents (many of whom own timeshare interests in Florida).

49.     TET also executed agreements with Wyndham Owners, many of whom are Florida residents. TET was to perform the contracts, in whole or in part, in Florida, in that they were allegedly to negotiate with Plaintiffs to secure the release of any future obligations owed to Plaintiffs, and the cancellation of the Wyndham Owners' contracts with Plaintiffs. To affect the cancellation, Defendants caused thousands of letters to be mailed to Plaintiffs in Florida.

50.     In addition, Defendants' internet-based operations subject them to personal jurisdiction in the state of Florida. Defendants do not operate a passive advertising website; rather Defendants do business over the internet by entering into contracts with residents of Florida through the website, which involves the repeated transmission of computer files over the internet and allows Florida residents to exchange their contact information with a host computer. Defendants operate numerous websites, including, without limitation, www.timeshareexitteam.com, www.reedhein.com, and www.321exit.com, to solicit consumers.

### v.   Venue

51.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims occurred in Florida and Defendants' conduct giving rise to the claims set forth herein occurred in this District.

### vi.   Conditions Precedent, Attorneys' Fees

52.   All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

53.   Wyndham has retained the services of the undersigned lawyers to represent it in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are recoverable against Defendants pursuant to 15 U.S.C. § 1117 and Fla. Stat. § 501.2105.

### D.   BACKGROUND ON THE TIMESHARE INDUSTRY

54.   Timeshare properties, also known as vacation rentals, revolutionized the vacation and travel industry and have been a popular option for families for decades.  Prior to the inception of the timeshare industry in the United States, anyone wanting to vacation in the same destination each year faced the limited options of (a) booking a hotel in advance and paying the daily rate (assuming availability) or (b) purchasing a vacation property (a significant financial investment with ongoing obligations of care, repair, and maintenance).

55.   The birth of the innovative timeshare concept in the 1970s changed the vacation landscape. Now, developers, like Wyndham, can divide a single vacation unit between 52 owners, with each owner purchasing a fractional interest of the whole for a specified share of the total price, i.e. deeded ownership.  Developers, like Wyndham, also sell membership interests to consumers in the form of points, which, in turn, are exchanged for use at Wyndham properties. Wyndham Owners may also belong to a Wyndham program called 'Club Wyndham Plus', which allows owners to use their ownership at Wyndham resorts to stay at additional properties that Wyndham does not own, further expanding consumers' choices.

56.   This concept has allowed consumers an incredible opportunity to enjoy regular vacations at a fraction of the typical cost and without the burdens associated with undivided

vacation property ownership. Moreover, in exchange for payment of a regular maintenance fee, timeshare owners receive assurance of high quality resorts every year, while simultaneously avoiding rising future prices.

57.     Today, the timeshare industry continues to thrive.  As reported by the American Resort Development Association ("ARDA"), "the timeshare industry remains healthy, showing that owners have become increasingly engaged with their timeshares and the timeshare lifestyle, while the industry continues to attract new buyers." As of 2016, 9.2 million households in America were timeshare owners.

### E.     THE WYNDHAM ENTITIES & THEIR VALID TIMESHARE CONTRACTS

58.     Wyndham is a global leader in the timeshare and vacation ownership industry with a network of resorts spanning the world.

59.     Wyndham Vacation Ownership, Inc. ("WVO") is the parent company or ultimate parent company of the entities that conduct timeshare sales and development activities throughout the United States: Wyndham Vacation Resorts, Inc. ("WVR"), Wyndham Resort Development Corporation ("WRDC"), and Shell Vacations LLC ("SV"), SVC-West, SVC-Americana, and SVC-Hawaii.

60.     As part of its business, WVR, WRDC, SVC-West, SVC-Americana and SVC-Hawaii enter into Timeshare Contracts with consumers (e.g., the Wyndham Owners).  At the time Wyndham Owners purchase timeshares from WVR, WRDC, and/or the SVC entities, the Wyndham Owners execute Contracts for Purchase and Sale wherein the Wyndham Owners agree to pay an amount certain for the timeshare interest, as well as maintenance and/or annual fees to Wyndham for the upkeep of the timeshare units and common areas of the timeshare properties. In addition, the Wyndham Owners agree to pay a pro-rated share of the property taxes to

- 18 -

Wyndham, which is then submitted by Wyndham to the appropriate local tax collectors.   Often, if a purchaser desires mortgage financing, he or she may apply for a mortgage, and after approval, may execute a Promissory Note and Mortgage, which are referenced and incorporated in the Purchase Agreement.   These Timeshare Contracts are legally binding contracts and, after the passage of a statutory rescission period, cannot be unilaterally rescinded or cancelled.

**F.    BACKGROUND ON TIMESHARE "EXIT" COMPANIES AND THEIR PREDATORY SCHEMES TO DEFRAUD TIMESHARE OWNERS**

61.    In the aftermath of the late 2007 recession, a select group of individuals saw an opportunity to make fast cash from timeshare owners who no longer preferred to use their timeshare ownership for vacations.

62.    These individuals launched what have become known as "timeshare exit" or "third party exit" (TPE) companies that promote and market the ability to get timeshare owners released or otherwise discharged from their contracts – including the attendant financial obligations – with timeshare developers like Wyndham.

63.    Through various forms of advertising, TPE companies frequently state or imply that they have some sort of "process" or "method" to assist consumers in "canceling" or "exiting" their timeshare contracts.   TPE companies suggest that their services are necessary to cancel their timeshare contracts.   In reality, though, TPE companies have no method of helping consumers end their timeshare ownership.   At most, they merely retain lawyers to threaten litigation on the owners' behalves.

64.    As the price for their "cancellation" services, TPE companies demand exorbitant up-front fees from the timeshare owners – usually several thousand dollars per timeshare interest.

65.    To make matters worse, TPE companies steer consumers away from the free (or much cheaper) programs created by the timeshare developers, such as Wyndham's Ovation®

- 19 -

program, designed to resolve genuine problems with an individual's timeshare ownership, including options to lawfully cease that ownership.

66.     Nevertheless, after securing the up-front payments, TPE companies instruct owners to stop communicating with and stop sending payments to the timeshare developers, in order to facilitate the "exit" process.  In this way, TPE companies guide the owners' timeshare interests into default and eventual foreclosure.

67.     The TPE companies then "work" to cancel the timeshare contracts.  What they typically do is retain attorneys to send demand letters to the timeshare developers, demanding that the developers release the individual owners from their contracts.  Usually, these are form demand letters without specifics relating to the particular owners and, in the opinion of the developers, completely without legal merit.

68.     Although the attorneys are retained directly by the TPE companies, *not* by the owners, the demand letters typically (i) state that the attorneys represent the owners and (ii) forbid communication between the developers and the owners (sometimes citing to attorney ethics rules, provisions of the Fair Debt Collection Practices Act, etc.).  By making these representations, TPE companies and their affiliated attorneys prevent the timeshare developers like Wyndham from warning their owners of the consequences of utilizing the TPE companies' fraudulent services.

69.     When the attorneys' demands go unmet, the TPE companies prolong their clients' expectations regarding how long a successful "exit" can take.

70.     Eventually, though, each timeshare contract enters foreclosure proceedings, and after the foreclosure concludes, the TPE company will proclaim it helped its client successfully "exit" the timeshare contract.

71.     Consumers like Wyndham Owners are deceived and persuaded to pay exorbitant fees to the TPE companies under the auspices that the companies can and will cancel their timeshare contracts, but the advertised services are impossible, illusory, and illegal.

72.     Ultimately, not only are the developer's relationships with its owners irreparably damaged, the developers are dramatically financially impacted by the loss of millions of dollars in contract-based revenue.

73.     As for the timeshare owners, they lose their timeshare interests through foreclosure (even if they have fully paid the principal toward timeshare ownership) and suffer significant negative impact on their credit.

74.     Over the past decade, TPE companies have refined their trade and the sub-industry has reached new levels of damages.

75.     In recent years, a number of timeshare developers have filed lawsuits against TPE companies to stop their unlawful practices.[5]

76.     Consistent throughout all TPE schemes is the underlying reality that TPE companies purposely fail to inform consumers that, by utilizing their so-called methods, the owners actually breach and default on their timeshare contracts rather than achieve any lawful release or cancellation.

77.     As is evident, TPE companies exist for the sole and improper purpose of inducing consumers, including Wyndham Owners, to breach their valid and binding Timeshare Contracts.

78.     Wyndham is specifically targeted due to its size, the sheer number of Wyndham Owners, and the number of Wyndham-branded and managed properties throughout the U.S. and world.

---

[5] *See, e.g.*, *Diamond Resorts International, Inc., et al., v. US Consumer Attorneys, P.A., et al.*; Case No. 9:18-cv-80311-ROSENBERG/REINHART (S.D. Fla.); *Orange Lake Country Club, Inc., et al., v. Reed Hein & Assocs., LLC, et al.*, Case No. 6:17-cv-01542-GAP-DCI (M.D. Fla.).

G. **PLAINTIFFS AND DEFENDANTS ARE DIRECT COMPETITORS.**

79.     Plaintiffs and Defendants are direct competitors.   While Defendants will undoubtedly deny this allegation because it suits their needs for this litigation, outside of the courtrooms of the United States, Defendants have taken a very different position.

80.     TET filed an application to register its alleged TIMESHARE EXIT TEAM logo service mark with the United States Patent and Trademark Office ("USPTO") – Application Serial Numbers 87/684,112 (the "'112 Application").   An accurate copy of the file wrapper for the '112 Application as maintained by the USPTO is annexed hereto as Exhibit 5.

81.     The '112 Application is a "use in commerce" application, also known a "1(b)" application.

82.     The '112 Application was filed with the USPTO on November 14, 2017.

83.     As part of a 1(b) application, the applicant (in this case TET) must state that the applied-for mark is being actively used in commerce as of the date of the application.

84.     Accordingly, as part of its '112 Application, TET alleged that its mark was in use as of November 14, 2017 in International Class 036 for "Vacation real estate timeshare services":



| ▾ **Goods and Services** | | |
|---|---|---|
| Note: | | |
| The following symbols indicate that the registrant/owner has amended the goods/services: | | |
| • Brackets [..] indicate deleted goods/services; | | |
| • Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and | | |
| • Asterisks *..* identify additional (new) wording in the goods/services. | | |
| **For:** Vacation real estate timeshare services | | |
| **International Class(es):** 036 - Primary Class | | **U.S Class(es):** 100, 101, 102 |
| **Class Status:** ACTIVE | | |
| **Basis:** 1(b) | | |

85.     TET provided examples of its alleged mark in commercial use and advertising, including examples of its alleged mark in use relating to 'vacation real estate timeshare services'. *See* Exhibit 5.

86.     The '112 Application was signed by Jennie Steed, vice president of marketing for TET, under the penalty of 18 U.S.C. § 1001, which makes it a felony (punishable by a fine and/or imprisonment of up to eight years) to make a false statement on a trademark application.[6]

87.     Wyndham owns or utilizes under license multiple service marks and service mark applications within the 'vacation real estate timeshare services' in International Class 036, including, without limitation: WORLDMARK BY WYNDHAM (U.S. Reg. No. 5,123,460) and OVATION (U.S. Reg. No. 5,036,381).

88.     By the owner admissions to the USPTO, Defendants' commercial efforts are in direct competition with Wyndham's businesses.

89.     Once a Wyndham Owner enters into an agreement with TET, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Defendants.

90.     Because Sussman, SGB, and Privett are the entities through which services advertised by TET are actually provided (as set forth in more detail both above and below), Sussman, SGB, and Privett are also acting as direct competitors to Wyndham as, without them, TET's business would not function.

---

[6] Trademark applications must be verified or declared under penalty.  *See* 15 U.S.C. §1051; 37 C.F.R. §§ 2.2(n); 2.32(b), 2.20.

ORLDOCS 16463396 7

**H.    FALSE ADVERTISING BY THE "THIRD PARTY EXIT" COMPANIES-SUCKERING THE CONSUMER AND TARGETING WYNDHAM**

91.    TET carefully curates its advertisements and client communication to hide the true result of its "exit process."  By not disclosing the truth of the "process," the advertisements and statements made by TET are deceptive and misleading.  As explained above, there is no process or service Defendants can offer that results in the legitimate cancellation of a Timeshare Contract.

**i.    Domain Names Used to Advertise**

92.    TET owns and operates (or has operated) at least three websites that advertise timeshare-related services:

      a.    www.timeshareexitteam.com;

      b.    www.reedhein.com; and

      c.    www.321exit.com.

93.    In addition, TET is the actual owner, operator, or beneficial user of over 6,000 domain names that are used to send mass-market and/or spam emails to untold numbers of individuals.  These domains are listed in Exhibit 6 hereto.  While the list annexed hereto as Exhibit 6 contains two different names as the alleged 'owners' of the listed domain names, the names and addresses used to register the domain names are fake.

94.    It is likely that TET operates additional websites that engage in timeshare-related advertising for "exit," "cancellation," "release," "redemption," or "transfer" services that will be uncovered during the course of discovery in this matter.

**ii.    Content of the Misleading, Online Advertising**

95.    As explained above, TET falsely advertises regarding how it supposedly assists Wyndham Owners with the termination of their Timeshare Contracts.  In short, TET misleads

- 24 -

Wyndham Owners into thinking that TET's services and commercial activities will lead to a lawful release, rescission, termination, cancellation, or transfer of a timeshare contract – advertising its services as "safe" and "legitimate" – when in reality TET deceives and induces Wyndham Owners into breaching their Timeshare Contracts which unlawfully terminates those contracts.

96.     TET falsely advertises in at least the following ways:

    a.     Misrepresenting its own services or commercial activities as providing an "exit" or "cancellation" of a Timeshare Contract, or by using any other word or phrase (i.e. "get out" or "eliminate") that means or implies the lawful termination of a Timeshare Contract.  TET cannot truthfully advertise, offer, or provide a Wyndham Owner with a lawful termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized TET to advertise or make a public offer regarding Wyndham's contracts and, in fact, Wyndham does not consent to such. Examples of this false advertising include, but are not limited to, the following:

        i.     "We are here to eliminate your unwanted timeshare and help you move one step closer to financial peace of mind." (https://timeshareexitteam.com/)

        ii.     "Timeshare Exit Team is the industry leader in helping people exit their unwanted timeshares." (https://timeshareexitteam.com/about-us/)

        iii.     "Today, Timeshare Exit Team helps thousands of customers exit their timeshare every year." (https://timeshareexitteam.com/about-us/)

b.      Misrepresenting its own services or commercial activities as providing a "process" or "method" that results in a timeshare owner being free from the obligations and benefits of a timeshare contract.  TET cannot truthfully advertise to a Wyndham Owner any "process" or "method" that results in a lawful termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to advertise, represent, or even suggest that Wyndham participates in any such process to achieve the advertised result.  To the extent that TET desires to advertise lawyer services for the purpose of filing litigation aimed at achieving the equitable rescission of any timeshare contract, even that process is not a service of any Defendant, but rather a potential result of litigation within the *judicial* process.  Examples of this false advertising include, but are not limited to, the following:

   i.   "How Our Process Works" (https://timeshareexitteam.com/about-us/our-process/)

   ii.  "Timeshare Exit Team will manage the stress of your exit on your behalf, keeping you informed throughout the process. The exit timeline will depend on a variety of factors, but typically ranges between 9 to 18+ months." (https://timeshareexitteam.com/about-us/our-process/)

c.      Misrepresenting its own services or commercial activities as providing a "legal," "lawful," "legitimate," or "safe" means of terminating a timeshare contract or otherwise releasing or freeing a timeshare owner from the obligations and benefits of a timeshare contract.  TET falsely equates (i) the termination of a Timeshare Contract through breach, default, and/or

foreclosure (the actual result of their "exit services") with (ii) a "lawful" or "legitimate" and "safe" result.  Under basic principles of the law, the breach of any contract typically subjects the defaulting party to resulting damages.  In this way, a breach does not "lawfully" or "legitimately" or "safely" free or release a Wyndham Owner from the Timeshare Contract, but instead triggers the non-defaulting party's (Wyndham's) rights to seek legal and equitable remedies in court and otherwise for the unlawful termination.  The contract is never cancelled or "exited"; to the contrary, it is fully enforced, including, without limitation, foreclosure of the Timeshare Contracts and damage to the Wyndham Customer's credit. Because TET instructs, recommends, induces, or persuades Wyndham Owners into stopping payments on their Timeshare Contracts and thus defaulting on those legal instruments, Defendants cannot truthfully advertise that the resulting termination of the Timeshare Contracts is in any way "lawful" or "legitimate."  To do so misleads the public. Examples of this false advertising include, but are not limited to, the following:

i.    "Owners must have a way to safely and legally end their timeshare ownership when it no longer fits their lifestyle. . . . Timeshare Exit Team steps in to provide a safe and permanent way out." (https://timeshareexitteam.com/about-us/)

ii.   "Timeshare Exit Team assures you will be exited from ownership safely, legally, and forever." (https://timeshareexitteam.com/about-us/our-process/)

iii.  "Ownership is legitimately transferred. Depending on the property of record, title is transferred via deed, membership, lease, assignment, or as required by resort official governing documents (covenants,

- 27 -

conditions,       restrictions).”   (previous       version       of https://timeshareexitteam.com/faqs/)

  d.       Misrepresenting its own services or commercial activities as providing a "guaranteed" means of terminating a timeshare contract or otherwise releasing or freeing a timeshare owner from the obligations and benefits of a timeshare contract.   TET cannot truthfully advertise a "guaranteed" termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to "guarantee" any lawful termination, release, or rescission regarding Wyndham's Contracts.   To the extent a Wyndham Owner's breach or default of a timeshare contract and resulting foreclosure of that interest "guarantees" its termination, such result does not owe to any service or commercial activity by the Defendants.   To the contrary, a Wyndham Owner can breach a Timeshare Contract without any involvement by Defendants, therefore the fact that Defendants charge exorbitant fees to persuade a Wyndham Owner to breach the Timeshare Contract makes evident the scam they perpetuate. Examples of this false advertising include, but are not limited to, the following:

   i.   "We are so confident in our results that we offer a 100% money-back guarantee." (https://timeshareexitteam.com/)

   ii.   "Timeshare Exit Team helps thousands of people exit their timeshares each year and offers a 100% money-back guarantee. If we don't get you out of your timeshare, you get a full refund." (https://timeshareexitteam.com/exit-options/)

e.      Misrepresenting their own services or commercial activities as allowing a timeshare owner to stop paying mortgage payments or fees, including maintenance fees, or to otherwise avoid the contractual obligations of a timeshare contract.  TET cannot truthfully advertise, offer, or provide a Wyndham Owner with the consequence-free right to stop making payments on a Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to advertise that a Wyndham Owner can stop making payments or otherwise stop fulfilling the contractual obligations on Wyndham's Contracts.  Examples of this false advertising include, but are not limited to, the following:

i.      "Our services are for all owners who are ready to be completely free from any unwanted timeshare obligations." (previous version of https://timeshareexitteam.com/faqs/).

97.     The foregoing advertisements are either literally false or they are deceptively misleading.  Again, there is no third-party basis to "exit" or "cancel" a timeshare contract.  There can certainly be no guaranteed result when such result is dependent on Wyndham's agreement.

98.     TET's money back guarantee is also misleading because it is contingent on a timeshare owner accepting *any* "exit" conditions: "[TET's] guarantee obligations are met when [TET] obtains an exit even if OWNER does not accept the terms . . . ." (https://timeshareexitteam.com/about-us/our-guarantee/)   Quite simply, a guarantee of an undefined "exit" result is really no guarantee at all, especially since this 'guarantee' means that a Wyndham Owner is obligated to accept a foreclosure of their timeshare interest.

99.     The advertisements fail to disclose that TET's actual process or method of terminating a timeshare contract is through breach and default, and that a foreclosure and/or fraudulent transfer is what the Defendants consider to be a successful "exit."  The advertisements also fail to disclose the severe negative impact on a Wyndham Owner's credit if they follow Defendants' "process."

100.    TET previously advertised a list of reasons why a timeshare owner should use TET's "exit" services (previous version of https://timeshareexitteam.com/faqs/), but none of these advertised reasons is a legally sufficient basis to terminate or stop making payments on a timeshare contract. As a result, this list of reasons to "exit" through TET is misleading to consumers such as Wyndham Owners:

> Timeshare Exit Team is for timeshare owners who are:
> - Not using their timeshare as much as they intended to
> - Frustrated by unexpected "special assessments" and skyrocketing maintenance fees
> - Financially set back by their timeshare maintenance fees and special assessments
> - Frustrated by their failure to sell the timeshare through a listing company
> - Concerned about their children inheriting their timeshare and then consequently becoming financially responsible for it
> - Bothered they can't vacation where they want, when they want
> - Tired of going to the same place every year
> - Aggravated with exchange companies
> - Realizing that there are more ways to go on vacation for much less
> - Widowed or divorced, or are no longer able to travel with their loved ones
> - Inheritors of a timeshare they don't want or use
> - Part of resort scams

101.    Similarly, TET has previously advertised that a timeshare owner's circumstances do not even matter: "The circumstances of your timeshare or your status with the resort do not matter – we can help you. Plus, with our consultation being free and a 100% money back guarantee you can evaluate if we are the right partner for you without any risk." (previous version of https://timeshareexitteam.com/faqs/)

- 30 -

102.     TET also make false statements about Plaintiffs' products and services.  TET falsely states or implies that timeshare companies like Wyndham will not release timeshare owners from their contracts.  This is untrue because Wyndham has its Ovation® Program and Wyndham Cares™ Program – two marked services of Wyndham in the same international class (036) in which TET is attempting to register its alleged mark, which are available to assist Wyndham Owners who may wish to legitimately end their timeshare ownership with Wyndham.  By misrepresenting the options available through Wyndham's Ovation® Program and Wyndham Cares™, TET misleads Wyndham Owners into procuring the Defendants' illusory and illegitimate services instead.  TET engages in other forms of online advertising, such as through search engines, social media platforms, and paid advertisements on unrelated websites.

103.     In addition to its online advertising, TET conducts extensive advertising through more traditional methods of advertising such as radio, television, print media, shows, expos, and fairs.

104.     The advertisements run by TET are made and created, at least in part, by Happy Hour, which also places the advertisements into interstate commerce.

### iii.     <u>Payment for the Advertised Services</u>

105.     Hundreds of Wyndham Owners have each paid TET substantial amounts of money – often in the thousands of dollars – to procure TET's so-called services advertised online and elsewhere.

106.     TET advises and induces these Wyndham Owners to stop making payments under their Timeshare Contracts by creating the misconception that Wyndham will be more willing to release Wyndham Owners from their Timeshare Contracts if payments stop altogether, suggesting that TET's (including TET's agents and lawyers') negotiating power will increase against Wyndham.  This is, in fact, false.

107.    Thus, as a direct result of TET's advertising and subsequent dealings with Wyndham Owners, Wyndham Owners cease making payments on their Timeshare Contracts.

I.    **THE LAW FIRM DEFENDANTS**

108.    The law firm defendants, Sussman, SGB, and Privett, conspire with TET to execute the scheme of false advertising outlined above, to execute the fraudulent 'services' that are promised by TET, and directly profit and benefit from same.

109.    Sussman, SGB, and Privett all have individual bulk retainer agreements with TET.

110.    Under their retainer agreements, Sussman, SGB, and Privett accept clients from TET – clients TET obtained through its false and misleading advertising – and take a fixed fee, which is a portion of the fee the consumers pay to TET.

111.    In exchange for the fees, Sussman, SGB, and Privett do almost no work whatsoever.  As Sussman has admitted, he would obtain a file and have someone in his office send a boilerplate demand letter to the timeshare developer, such as Wyndham.  After that, Sussman would do almost nothing, other than sometimes send a follow-up letter.  There are no substantive negotiations between the timeshare developer, such as Wyndham, and Sussman.  Essentially, Sussman simply hopes that Wyndham will agree to settle a case and does nothing further on behalf of the Wyndham Owner.

112.    Sussman does not meet or speak with the Wyndham Owners on whose behalf he sends letters.

113.    Sussman does not represent the Wyndham Owners on whose behalf he sends letters.

114.    Indeed, Sussman's retainer agreement specifically excludes the possibility of filing of legal action in state or federal court without an additional retainer agreement.

115.   SGB and Privett behave in the same way as Sussman, doing minimal work for Wyndham Owners they never or rarely meet, usually only sending demand letters on their behalf.

116.   SGB does not meet or speak with the Wyndham Owners on whose behalf it sends letters.

117.   SGB does not represent the Wyndham Owners on whose behalf SGB sends letters.

118.   Privett does not meet or speak with the Wyndham Owners on whose behalf he sends letters.

119.   Privett does not represent the Wyndham Owners on whose behalf he sends letters.

120.   Copies of sample correspondence sent by Sussman to Wyndham regarding Wyndham Owners are annexed hereto as Composite Exhibit 7.  For each customer, what is attached hereto is the entirety of the correspondence between Wyndham and any of the Defendants.

121.   Copies of sample correspondence sent by SGB to Wyndham regarding Wyndham Customers are annexed hereto as Composite Exhibit 8.  For each customer, what is attached hereto is the entirety of the correspondence between Wyndham and any of the Defendants.

122.   Copies of sample correspondence sent by Privett to Wyndham regarding Wyndham Customers are annexed hereto as Composite Exhibit 9.  For each customer, what is attached hereto is the entirety of the correspondence between Wyndham and any of the Defendants.

123.   The demand letters and other correspondence sent by the lawyer-defendants are typically boilerplate in substance and, to the extent any letters allege legal violations, the threats

of litigation are considered meritless by Wyndham.  Considering the volume of identical or nearly identical demand letters sent by the lawyer-defendants on behalf of Wyndham Owners whom the lawyers have never met or spoken with, the demand letters are not genuine litigation activity.

124.    None of TET, Sussman, SGB, and Privett ever "work with timeshare companies to exit [the customer's] timeshare".

### J.    INDIVIDUAL LIABILITY

125.    Reed and Hein actively and knowingly cause the false advertising by TET.  They direct, control, ratify, authorize, personally participate in, and/or are the moving forces behind the false and misleading advertising alleged herein for those TPE Defendants.

126.    TET employees have testified that Reed and Hein make the strategic decisions for TET and make decisions regarding advertisements.

127.    Additionally, TET employees have testified that Parenteau personally directs and controls the activities of TET and its advertising.

128.    TET's website explains that Reed is the mastermind behind TET's fraudulent "exit" scheme: "Developing a legitimate process to exit took Brandon time, research, and persistence."  (https://timeshareexitteam.com/about-us/)

129.    TET's website previously advertised a personal quote by Reed: "'Our personal GUARANTEE to you is that our team of consumer advocates will get you out of your timeshare, period.' Brandon Reed, Founder, Timeshare Exit Team"

130.    More than just being officers of TET, Reed and Hein personally participate in the interference of Wyndham Owners' Timeshare Contracts.

131.    After all, Reed and "his business partner" formed TET "when they began helping consumers successfully exit their timeshare burdens." (https://timeshareexitteam.com/faqs/will-i-be-working-with-timeshare-exit-team-or-reedhein-associates/)

132.    Reed and Hein direct and/or personally authorize TET employees and representatives to instruct Wyndham Owners to stop making payments under their Timeshare Contracts.

133.    Reed and Hein are therefore individually liable for the false advertising and tortious interference by TET.

134.    Sussman and Privett are individually liable for tortious interference because they personally participate in the conduct that severs the contractual relationships between Wyndham and the Wyndham Owners, including but not limited to, sending meritless demand letters insisting that Wyndham stop communicating with its Owners and demanding that such valid contracts be terminated.

K.    **WYNDHAM'S RIGHT TO INJUNCTIVE RELIEF**

135.    Defendants' solicitation of Wyndham Owners using false and misleading advertising and their subsequent instruction to and/or persuasion of the Wyndham Owners to stop making payments on the Timeshare Contracts, including all mortgage, maintenance, and tax payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation with Plaintiffs, is harming Plaintiffs.

136.    Defendants continue to engage and intend to further engage in the unlawful conduct described above.

137.    Defendants' actions present an immediate threat of irreparable harm to Plaintiffs, and Plaintiffs will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

- 35 -

138.     The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Wyndham Owners using the false and misleading advertising outlined above; and then convince the Wyndham Owners to immediately stop paying.  These defaults result in loss of good will and damages to the customer relationship with other Wyndham Owners that are not in default and enjoying their Wyndham Contracts.

139.     Non-defaulting Wyndham Owners are also damaged because the non-payment of taxes and maintenance fees by the defaulting Wyndham Owners force the non-defaulting Wyndham Owners to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

140.     Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance, and tax payments owed to them and will be forced to expend monies foreclosing on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

141.     Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this activity.

142.     The injury and potential harm caused by Defendants' intentional inference with Plaintiffs' relationships outweigh the harm, if any, that an injunction would cause to Defendants.

143.     The issuance of the requested injunction will serve the public interest by protecting Plaintiffs' legitimate business interests and the interests of the Wyndham Owners, and by restraining the unlawful, disruptive and tortious actions committed by Defendants.

L.      **CAUSES OF ACTION**

**COUNT I**
**False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against TET, Reed, Hein, and Parenteau)

144.    Wyndham adopts and realleges paragraphs 1 through 143 above as if fully set forth herein.

145.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

146.    Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

147.    The representations described above were commercial speech made by a Defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for Defendants' own financial gain, for the purpose of influencing consumers to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

148.    Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

149.    Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or to utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

150.    Defendants deceive the consuming public by knowingly concealing the existence of the Ovation® Program and concealing the legitimate options available to Wyndham Owners,

and instead tell consumers that Wyndham will do nothing to help consumers end their timeshare ownership.

151.    Defendants' advertised services affect interstate commerce.

152.    Defendants are operating as competitors to Wyndham.  Once a Wyndham Owner enters into an agreement with TET, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Defendant.

153.    Wyndham has been and continues to be injured as a result of Defendants' false and misleading statements.

154.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Wyndham Owners, and (iii) the costs of this action.

155.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

**COUNT II**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against Sussman, SGB, and Privett)

156.    Wyndham adopts and realleges paragraphs 1 through 143 above as if fully set forth herein.

157.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

158.    TET willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements

- 38 -

described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

159.    Wyndham has been and continues to be injured as a result of TET's false and misleading statements.

160.    Sussman, SGB, and Privett have contributed and continue to contribute to TET's false advertising by knowingly inducing or causing the conduct, or by materially participating in it.

161.    Sussman, SGB, and Privett explicitly or implicitly encourage the false advertising because they accept legal representation of the consumers deceived by the false advertising. Without Sussman's, SGB's, and Privett's willingness to accept those consumers as clients, TET could not advertise what they do.

162.    TET's false advertisements are public, serious, and widespread, therefore Sussman, SGB, and Privett have full knowledge of such advertising and condone it.

163.    More than that, Sussman, SGB, and Privett each individually financially gain from the false advertisements in the form of client referrals and fee splitting with TET.

164.    In other words, each of Sussman's, SGB's, and Privett's businesses derive much, if not all, of its revenue from the consumers solicited through the TET's false advertising.

165.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising by TET, (ii) Sussman's, SGB's, and Privett's profits resulting from TET's false advertising to Wyndham Owners, and (iii) the costs of the action.

166.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by Sussman, SGB, and Privett of 15 U.S.C. 1125(a).

## COUNT III
### Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against Happy Hour)

167.    Wyndham adopts and realleges paragraphs 1 through 143 above as if fully set forth herein.

168.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

169.    TET willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

170.    Wyndham has been and continues to be injured as a result of TET's false and misleading statements.

171.    Happy Hour contributes and continues to contribute to TET's false advertising by knowingly inducing or causing the conduct, or by materially participating in it.

172.    Happy Hour explicitly or implicitly encourage the false advertising because it is the in-house advertising firm for TET and was created by Reed and Hein for this purpose. Without Happy Hour's wok, TET could not advertise what they do.

173.    Happy Hour has full knowledge of such advertising and condones it, frequently creating and distributing the advertisements itself.

174.    More than that, Happy Hour financially gains from the false advertisements in the form of payments (and startup capital) from TET.

ORLDOCS 164633967

175.    In other words, Happy Hour derives much, if not all, of its revenue from TET's false and misleading advertising.

176.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising by TET, (ii) Happy Hour's profits resulting from TET's false advertising to Wyndham Owners, and (iii) the costs of the action.

177.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by Happy Hour of 15 U.S.C. 1125(a).

## COUNT IV
### Tortious Interference with Contractual Relations
(against all Defendants)

178.    Wyndham adopts and realleges paragraphs 1 through 143 above as if fully set forth herein.

179.    This is a cause of action for tortious interference with contractual relations.

180.    Wyndham has contractual relationships with its timeshare owners.

181.    Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis upon which Defendants sought to establish a relationship with the Wyndham Owners.  Indeed, if it were not for the existence of the contractual relationships between Wyndham and the Wyndham Owners, Defendants would have no reason to exist.

182.    Defendants have successfully solicited Wyndham Owners[7] and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or the SVC entities.

183.    In particular, Defendants have intentionally procured the breach of Wyndham's contractual relationships by soliciting Wyndham Owners and persuading them to hire Defendants to help "exit" (in reality, breach) their Timeshare Contracts.

184.    Defendants also procure breaches by directly instructing Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

185.    If Wyndham Owners knew the truth about Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to Defendants nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

186.    Defendants have utilized improper, fraudulent and/or illegal means to interfere with Plaintiffs' contractual relations.

187.    Defendants' actions were done with improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

188.    As a direct and proximate result of Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual

---

[7] Due to the confidential and sensitive nature of the identity of Wyndham Owners who have been victims of Defendants' conduct, as well as the sheer volume of Owners impacted, Wyndham has not included their identifying information herein.  However, Wyndham can and will provide the Court with copies of the contracts with which Defendants have interfered at the appropriate time.

relationships with Plaintiffs and, more specifically, WVR, WRDC, and/or the SVC entities, before the expiration of the terms of those contracts.  These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

189.    Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as Defendants are strangers to the contractual relationships between Wyndham and its Owners, and their interference with Plaintiffs' business is willful and malicious.

190.    TET is not a law firm and has no attorney-client relationships with Wyndham Owners, therefore TET is not privileged to interfere under the attorney-client privilege.

191.    TET is not an agent of the Wyndham Owners, because the Wyndham Owners do not control the actions of TET.  Rather, TET controls and guides the "exit" strategy as a so-called "service" it provides to the Wyndham Owners.

192.    To the extent any Wyndham Owners have appointed TET as attorney-in-fact to manage, dispose of, sell, negotiate, resolve, release, settle, or convey their timeshare interests, such agency does not include the authority to unlawfully breach the Timeshare Contracts. Therefore TET's actions to induce such breach are beyond the scope of any agency that may have been created.

193.    Further, TET is motivated by personal gain and not by the interests of the Wyndham Owners.

194.    Therefore, TET is not privileged to interfere as an agent of the Wyndham Owners.

195.    Similarly, the lawyer Defendants (Sussman, SGB, and Privett) have failed to establish an attorney-client relationship with the Wyndham Owners who paid and retained TET's so-called services.

196.    Accordingly, the lawyer Defendants are not privileged to interfere with Wyndham's Timeshare Contracts.

197.    Even if the lawyer Defendants have established an attorney-client relationship, however, these Defendants profit greatly by accepting significant fees from Wyndham Owners (through TET) then performing little or no actual legal work on their behalf to "exit" their timeshare contracts.  Instead, Defendants convince Wyndham Owners to stop making payments on their Timeshare Contracts which is not in the Owners' best interests and which greatly damages the Owners' finances and credit, in order to achieve the desired "exit."

198.    The lawyer Defendants are therefore not privileged to interfere with Wyndham's contractual relationships because these Defendants act in their own interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received from the Wyndham Owner or even the best course of action to terminate the Timeshare Contract, considering the Wyndham Owner could lawfully terminate his or her contract for free, or at a much lower cost, by appealing directly to Wyndham.

199.    Furthermore, the lawyer Defendants (Sussman, SGB, and Privett) undermine any attorney-client relationship by rarely or never filing lawsuits on behalf of those Wyndham Owners related to their timeshares and by rarely or never representing Wyndham Owners in foreclosure proceedings on their timeshare interests.   In other words, the lawyers only "represent" timeshare owners for the purpose of breaching contracts under the guise of legality.

200.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

201.   Plaintiffs are entitled to damages against all Defendants jointly and severally.

202.   Defendants' ongoing conduct has caused, and if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

203.   Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

**COUNT V**
**Violation of Florida's Deceptive and Unfair Trade Practices Act**
(against all Defendants)

204.   Wyndham adopts and realleges paragraphs 1 through 143 above as if fully set forth herein.

205.   This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

206.   Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

207.   Wyndham's owners and prospective owners are consumers for purposes of FDUTPA.

208.   Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

209.   Defendants are engaged in deceptive and unfair practices, including luring Wyndham Owners into procuring Defendants' illusory services with false advertising and using misrepresentations to convince Wyndham Owners to pay substantial fees to "exit" their Timeshare Contracts with Wyndham, when, in many instances, a lawful termination is only

available to consumers directly from Wyndham, a party to the Timeshare Contracts, through the Ovation® Program.

210.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So.3d 1149, 1152 (Fla. 5th DCA 2012).

211.    Under Section 501.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under § 510.211(2), Fla. Stat. *Id.*; *see also Kinger v. Weekly World News, Inc.*, 747 F.Supp. 1477, 1480 (S.D. Fla. 1990).

212.    Wyndham is a party aggrieved by Defendants' violation of FDUTPA, Section 501.204(1), Fla. Stat.

213.    As a result of Defendants' actions, Wyndham has suffered financial loss.

214.    Wyndham's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

215.    Wyndham is entitled to recover its attorney's fees and costs from Defendants under Sections 501.2105 and 501.211, Fla. Stat.

**COUNT VI**
**<u>Civil Conspiracy to Commit Tortious Interference</u>**
(against all Defendants)

216.    Wyndham adopts and realleges paragraphs 1 through 143 above as if fully set forth herein.

217.    This is a cause of action for civil conspiracy to interfere with existing contractual relations.

218.    Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

219.    Defendants conspired to do an unlawful act to cause Plaintiffs harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' business relations with it owners and/or causing its owners to breach their Timeshare Contracts with Plaintiffs.

220.    Defendants committed or engaged in overt acts in furtherance of their unlawful conspiracy to interfere with Plaintiffs business relations or to induce Plaintiffs' customers to breach their contractual agreements.

221.    Defendants conspired to interfere with Plaintiffs' contractual relationships with the Wyndham Owners and/or were directed by other Defendants to interfere with Plaintiffs' contractual relationships with the Wyndham Owners.

222.    Defendants each performed and/or were directed by other Defendants to perform one or more overt actions in furtherance of their conspiracy as set forth hereinabove.

223.    As a direct and proximate result of Defendants' civil conspiracy, Wyndham Owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs before the expiration of the terms of those contracts.

224.    Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts.

225.    Each of the Defendants have a personal stake in the conspiracy activities.

226.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

- 47 -

227.    Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and cause Wyndham and its business millions of dollars in actual damages.

228.    Defendants acted willfully and with malice in taking these actions.

229.    Defendants are jointly and severally liable to Plaintiffs for Damages.

230.    Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

**M.    <u>PRAYER FOR RELIEF</u>**

Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for:

a.    damages

b.    corrective advertising,

c.    disgorgement of Defendants' profits,

d.    together with interest thereon,

e.    an award of court costs,

f.    a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees under the Lanham Act,

g.    an award of attorney's fees under FDUTPA,

h.    entry of permanent injunctive relief against the Defendants, as well as their agents, representatives, employees, affiliates, prohibiting Defendants from publishing or contributing to any false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Wyndham Owners' timeshare interests, and

i.    for such other and further relief as the Court deems appropriate.

Dated: December 19, 2018

/s/ Alfred J. Bennington, Jr.
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**RAYMOND F. TREADWELL, ESQ.**
Florida Bar No. 93834
rtreadwell@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile:  (561) 822-5527

*Attorneys for Plaintiffs*

- 49 -