UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WYNDHAM VACATION
OWNERSHIP, INC., WYNDHAM
VACATION RESORTS, INC.,
WYNDHAM RESORT                      CASE NO. 6:18-cv-2171-Orl-31TBS
DEVELOPMENT CORPORATION,
SHELL VACATIONS, LLC, SVC-
WEST, LLC, SVC-AMERICANA,
LLC, AND SVC-HAWAII, LLC,

      Plaintiffs,

vs.

REED HEIN & ASSOCIATES, LLC,
BRANDON REED, TREVOR HEIN,
THOMAS PARENTEAU, HAPPY
HOUR MEDIA GROUP, LLC,
MITCHELL R. SUSSMAN, KEN B.
PRIVETT AND SCHROETER
GOLDMARK & BENDER, P.S.,

      Defendants.

_____/

## DEFENDANT MITCHELL SUSSMAN'S MOTION TO STRIKE AND EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT JEFFERY A. STEC, PH. D.

COMES NOW Defendant, MITCHELL SUSSMAN, by and through the undersigned attorneys, hereby files this Motion to Strike and Exclude Testimony of Plaintiff's Expert, Jeffery A. Stec, Ph. D., stating in support thereof as follows:

## I. <u>BACKGROUND</u>

In this case, Plaintiffs have disclosed Jeffery Stec, Ph. D, as one of their experts. (<u>See</u> Exhibit A – Report of Jeffery Stec, Ph. D).[1] The deposition of Mr. Stec occurred on March 9, 2021. (<u>See</u> Exhibit B). For the reasons stated herein, Mr. Stec's testimony should be stricken, and he should be precluded from offering any such opinions at the trial of this case.

## II. <u>DAUBERT STANDARD</u>

Expert testimony must satisfy the standard for admissibility in Federal Rule of Evidence 702, as clarified by <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.,</u> 509 U.S. 579 (1993) and <u>Kumho Tire Co., Ltd. v. Carmichael,</u> 526 U.S. 137 (1999).

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

The Court is required to act as a "gatekeeper" to ensure that proposed expert testimony satisfies Rule 702. <u>Kumho</u>, 526 U.S. at 152.

---

[1] Although Mr. Stec's report is marked CONFIDENTIAL, it has been previously filed on the Court docket. (<u>See</u> Doc. # 223).

As the proponent of Mr. Stec's testimony, Plaintiffs carry "a substantial burden" to show, by a preponderance of the evidence, "that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact." Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1107 (11th Cir. 2005). The Daubert test prescribes three conditions: "(1) the expert is sufficiently qualified to testify on the issues he intends to address; (2) the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" Guinn v. AstraZeneca Pharms., L.P., 602 F.3d 1245, 1252 (11th Cir. 2010)(citation omitted). The proponent must establish all three prongs of this Rule 702 inquiry. Cook, 402 F.3d at 1107, n.5.

## III.   **DAUBERT ANALYSIS**

Mr. Sussman does not challenge Mr. Stec's qualifications to opine as an expert. Rather, this Motion is directed to Mr. Stec's methodology,[2] or lack thereof,

---

[2]      Mr. Stec did not engage in a statistical analysis producing any statistical probability that can reliably be applied to this case. Rather, he conducted a survey to provide an analysis of consumer behavior which showed, at best, that the Welcome Email was deduced to have some effect on *those surveyed*. This, alone, fails to establish that the same effect would be found in the Timeshare Owners at issue, and to the same degree, with the requisite scientific certainty.   Statistics may be used to show a correlative relationship between a purported cause and perceived effect, but only a further

and his failure to assist the trier of fact to understand the evidence in this matter and/or to determine a fact at issue.

Mr. Stec was "asked by Wyndham's counsel to conduct a survey to evaluate whether Defendants' use of false and misleading statements in their **Welcome Email** have caused their customers to stop making payments to their timeshare company. To address this question, [he] conducted a survey to determine whether timeshare owners believed the alleged false and misleading statements instructed them to stop making payments to their timeshare company and the likelihood that they would stop making those payments **based on those statements**." (Exhibit A at 1)(emphasis added). Ultimately, according to Mr. Stec, the consumer behavior survey demonstrated:

> Controlling for pre-existing beliefs, guesses, and other background noise respondents may bring to the survey, 32.2% of respondents believed the alleged false and misleading statements in the Welcome Email sent by Timeshare Exit Team told them to stop making payments to the timeshare company; and
>
> Of those respondents, 18.5% were either Very Likely or Somewhat Likely to stop making payments to the timeshare company due to the alleged false and misleading statements in the Welcome Email.

(Exhibit A at 31-32). During the required Local Rule 3.01(g) conference, which was conducted prior to filing this Motion, Plaintiffs' counsel advised that Plaintiffs do

---

probabilistic analysis can show that that correlation is applicable to a broader pool - such as the Timeshare Owners here - from which it would be appropriate to infer causation.

not intend to utilize the 18.5% to extrapolate what percentage of the Timeshare Owners at issue were caused to breach in an attempt to show that 18.5% of the Owners at issue stopped making payments because of the Welcome Email. But, rather, Plaintiffs intend to use the 18.5% simply to show that the Welcome Email had a statistically significant impact on the Timeshare Owners who received it. Put another way, according to Stec, the 18.5% only indicates that the Welcome Email had a statistically significant correlation with the behavior of those who received it. To that end, Plaintiffs will only offer this "statistical analysis" for the Owners who, in fact, received the Welcome Email (which, admittedly is not all Owners at issue). Moreover, nothing in the report demonstrates conclusively that the Welcome Email was the procuring cause of any Timeshare Owner's breach, even if it is circumstantial evidence of a factor in a Timeshare Owner's decision making process.

### A. Mr. Stec Failed to Survey Timeshare Owners at Issue

The claims against Mr. Sussman are as follows:

Count II                    Contributory False Advertising[3]

---

[3]     At this time, it is unclear as to whether or not Plaintiffs intend to pursue Count II for Contributory False Advertising.  At the meet and confer Plaintiffs' counsel indicated that he would get back to the undersigned about Count II but, as of the filing of this Motion, no confirmation has been received one way or another. TET has been dismissed as a party to this litigation, and Plaintiffs, in their recently filed Motion for Partial Summary Judgment, are only seeking damages for the 250 Owners associated with Mr. Sussman.

Count IV                    Tortious Interference with Existing Contacts

Count V                     Florida Deceptive and Unfair Trade Practices

Count VI Civil       Conspiracy to Commit Tortious Interference

This Court, in a different but very similar matter, recently filed preliminary Jury Instructions for counts similar to those alleged against Mr. Sussman – Tortious Interference and FDUPTA. (See Westgate Resorts, LTD, et al v. Reed Hein & Associates, LLC, et al, Case No. 6:18-cv-1088-GAP-DCI). These preliminary Jury Instructions are instructive as to what the trier of fact will ultimately be asked to determine at the trial of this matter and, therefore, what is "relevant" in terms of expert opinion testimony:

**Tortious Interference**

Westgate claims that TET tortiously interfered with contracts between Westgate and its customers who owned timeshares, which caused harm to Westgate. TET denies that claim.

To succeed on its claim, Westgate must prove the following facts by a preponderance of the evidence for each timeshare contract that Westgate claims TET interfered with:

1. The existence of a valid and legally enforceable contract between Westgate and the Westgate timeshare owners;

2. That TET knew about that contract;

3. That TET intentionally procured a breach of that contract;

4. That TET had no justification or privilege for the interference; and

5. Westgate suffered damages from the breach.

A person interferes with a contract between two or more other persons if he or she induces or otherwise causes one of them to breach or refuse to perform the contract.

Intentional interference with another person's contract is improper. Interference is intentional if the person interfering knows of the contract with which he or she is interfering, knows he or she is interfering, and desires to interfere or knows that interference is substantially certain to occur because of his or her action.

You should consider these factors for each contract that Westgate claims that TET tortiously interfered with. That is, your decision on one Westgate owner's contract should not influence your decision on whether TET tortiously interfered with Westgate's contract with another owner.

If the greater weight of the evidence does not support Westgate's claim, then your verdict should be for TET. However, if the greater weight of the evidence supports Westgate's claim as to any of the contracts at issue, then your verdict should be for Westgate and against TET. In other words, Westgate does not need to prove its claims with respect to each and every contract. If there is sufficient proof relating to even just one contract, then your verdict should be for Westgate and against TET.

If you find for TET, you will not consider the matter of damages. But, if you find for Westgate, you should award Westgate an amount of money that the greater weight of the evidence shows will fairly and adequately compensate Westgate for the damage that was caused by the intentional interference with each of its contracts that you find were interfered with.

\* \* \*

**Florida Deceptive and Unfair Trade Practices Act**

The Florida Deceptive and Unfair Trade Practices Act (hereinafter "FDUTPA") makes it illegal for anyone to engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

Westgate claims that TET engaged in deceptive or unfair acts or practices, causing damages to Westgate.

To prove their claims, Westgate must prove the following facts by a preponderance of the evidence:

1. TET engaged in a deceptive or unfair act or practice in the conduct of its trade;

2. The deceptive or unfair act or practice was the legal cause of actual damages sustained by Westgate.

An act or practice is "deceptive" if it is likely to mislead a person or entity, acting reasonably in the circumstances, to the person or entity's detriment.

An act or practice is "unfair" if it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. An "unfair" practice or act must satisfy three tests:

a. it must produce substantial injury to Westgate;
b. the injury must not be outweighed by a benefit to consumers that the practice produces; and
c. it must be an injury that Westgate could not have reasonably avoided.

Engaging in a deceptive or unfair trade practice is a legal cause of loss if it directly and in natural and continuous sequence produces or contributes substantially to producing such loss, so that it can reasonably be said that, but for the violation, the loss would not have occurred.

You should consider these factors for each contract that Westgate claims TET engaged in a deceptive or unfair trade practice with. That is, your decision on one Westgate owner's contract should not influence your decision on whether TET engaged in a deceptive or unfair trade practice with Westgate's contract with another owner.

If the preponderance of the evidence does not support a violation of FDUTPA, then your verdict should be for TET. However, if the greater weight of the evidence supports a violation of FDUTPA, then you must determine whether Westgate has been aggrieved by TET's conduct.

If you find that Westgate has not shown by a preponderance of the evidence that TET has violated FDUTPA, then your verdict should be for TET.

> If you find that Westgate has shown that TET violated FDUTPA, then you must determine the damages, if any, sustained by Westgate because of the violation FDUTPA.

(See id. at Doc. # 417).

Whether or not Plaintiffs succeed on their claims against Mr. Sussman, for the Timeshare Owners at issue, requires a fact-based analysis. For example, as it relates to Plaintiffs' claim for Tortious Interference with existing Contracts, this Court has addressed the causation and damages issue several times under allegations less favorable to the Defendant but which nevertheless were concluded in Defendant's favor. Specifically, in Westgate Resorts, Ltd. v. Sussman ("Westgate-Sussman"), 387 F. Supp. 3d 1318 (M.D. Fla. 2019), Judge Dalton made it perfectly clear that the only way for plaintiffs to prove their damages was testimony from each and every timeshare owner at issue in the case. Westgate-Sussman, 2019 U.S. Dist. LEXIS 141161, at *9; and see Westgate-TET, Doc. 220, 223, 255 at 4:21-24; 410 at p.6-11 (finding statements from owners who do not testify to be inadmissible hearsay).

Despite this requirement, the "relevant consumer population" for Mr. Stec's survey was "timeshare membership owners in the United States." (Exhibit A at 11). In order to draw a sample from this relevant population, Mr. Stec created a sample design, utilizing Innovate MR's services, as follows:

> 29. To determine whether timeshare owners' would stop making payments to their timeshare company based on the alleged misleading statements

Timeshare Exit Team made in the Welcome Email to customers of their service, I constructed a sampling design and survey questionnaire that were used to collect the survey data. **I identified the target population for this study as U.S. adult residents who own or have owned a timeshare membership in the last twelve months**. To reach this target population, I conducted a double-blind internet survey asking a series of questions to collect the survey data.

. . .

32. **The target population for this study was timeshare membership owners in the United States.** In order to draw a sample from the relevant population, the sample design I created approximated the U.S. population. That sample was provided by InnovateMR, a leading data collection and survey research firm.

33. InnovateMR maintains a panel of approximately 2 million U.S. respondents that are recruited from a diverse blend of channels to ensure representativeness. InnovateMR implements quality controls within its data through a rigorous series of checks to limit over participation, mitigate bias, screen respondents, provide digital fingerprints for panelists, remove fraudulent responses, and capture straight-liners and speeders. InnovateMR thoroughly vets respondent data to ensure that the data it provides is accurate and reliable.

34. **To reach the defined target population, I randomly sampled from InnovateMR's panel**. A set of screening questions was used to select the appropriate respondents. Sample members were qualified to participate in the research study if they were at least 18 years old and indicated that within the last twelve (12) months they currently own or have owned a timeshare membership.

(Exhibit A at 10-12)(emphasis added).

Mr. Stec has performed no analysis as it relates to the Timeshare Owners at issue or any scientific analysis which permits the trier of fact to extrapolate his findings to them. The undersigned anticipates that Plaintiffs will nonetheless utilize Mr. Stec's opinion – derived from a consumer impact survey, from a panel of approximately 2 million U.S. recruited respondents, none of which are the

Owners contemplated in the allegations against Mr. Sussman – in an attempt to establish the damages Plaintiffs' claim related to the Timeshare Owners at issue. However, Plaintiffs should not be allowed to request the trier of fact make such unsupported leap.[4]

In <u>Washington v. Vogel</u>, 880 F. Supp. 1545 (M.D. Fla. 1995), Washington attempted to use statistical evidence, by Dr. William Pammer, to prove the defendants had a custom or policy of permitting race-based pretextual stops. (<u>Id.</u> at 1546). Specifically, through the testimony of Dr. Pammer, Washington sought to introduce statistical proof that a significant disparity existed between the percentage of African–American motorists who routinely traveled on Interstate 95 in Volusia County, and the percentage of African–American motorists who were stopped by SET during the time period relevant to this case. (<u>Id.</u>). The proffered

---

[4]     Furthermore, Rule 702 requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." <u>Daubert</u>, 509 U.S. 579, 591 (1993); <u>United States v. Downing</u>, 753 F.2d 1224, 1242 (3d Cir. 1985)("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"); <u>Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.</u>, 582 F.3d 1227, 1232 (11th Cir. 2009)("The party offering the expert testimony has the burden of demonstrating that the testimony is relevant to the task at hand and logically advances a material aspect of its case."); <u>In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.</u>, No. 12-MD-02324, 2014 WL 1669930, at *5 (S.D. Fla. Apr. 28, 2014)("The basic standard of relevance . . . is a liberal one . . . , but if an expert opinion does not have a valid scientific connection to the pertinent inquiry it should be excluded because there is no fit.").

statistical evidence was not relevant to the issue of whether Washington, in particular, was stopped on the basis of her race. (Id.). However, Washington asserted that Dr. Pammer's testimony was relevant to the issue of whether the Defendants had a custom and policy of targeting African–American motorists for pretextual stops on I–95. (Id. at 1546-47).

The defendants countered that the evidence was irrelevant **unless** the expert also considered data pertaining to the percentage of African–American motorists who commit traffic violations. (Id. at 1547).  The Court determined that "[w]hile it is true that statistical evidence can be an appropriate method for demonstrating discrimination and pretext,  statistics as well as scientific evidence must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known." (Id. at 1548). Applying the Daubert analysis to the instant case, the Court first considered whether the expert's testimony was supported by "good grounds," and then whether the expert's testimony would have assisted the trier of fact in understanding the evidence or in determining a fact in issue. (Id.). Since Dr. Pammer's proposed testimony met neither requirement, the Court excluded it. (Id.).

Here, as in Washington, Mr. Stec's testimony is not supported by "good grounds," as the survey was not conducted utilizing the Timeshare Owners at issue nor does it explain why his conclusions on the effect of the Welcome Email

can be applied to those Timeshare Owners.  The report, therefore, does not address the fact-based inquiry required for each Owner, as it relates to whether or not the "false and misleading statements in their **Welcome Email** have caused their customers to stop making payments to their timeshare company."

Based on Plaintiffs' counsel's representations, Mr. Stec would be limited in testifying, at most, that 18.5% of the time, the Welcome Email, for those Owners who received it, had *some* impact on the Owners' behavior.  However, Mr. Stec cannot state that (1) the Welcome Email was actually the procuring cause, let alone a factor, in the Owners' determination to stop making payment; and/or, therefore, that (2) the Welcome Email caused the Owners to stop making payments.  Rather, such determination requires a factual inquiry – from the Owner. Because Mr. Stec did not engage in such fact-specific analysis, the outcome of Mr. Stec's survey – and his testimony on same – does not assist the trier of fact in understanding the evidence or in determining a fact in issue.  Even if Mr. Stec's conclusion that the Welcome Email caused 18.5% of its recipients to feel "more likely" to stop paying, this would still require the trier of fact to make the unreasonable leap of logic that it actually caused those Owners to stop paying—and to therefore guess as much. Nothing in Stec's report, however, permits the trier of fact to extrapolate that the Welcome Email's effect on the surveyed can be applied to the Owners at issue in this case and with the same statistical probability.

B. **Mr. Stec Only Tested the Welcome Email**

Mr. Stec confirmed that the survey he conducted only tested TET's Welcome

Email; it did not test any other statements, including those made in TET's website,

sales video presentation or script:

> Q: It's my understanding that you were asked by Wyndham to conduct a survey to evaluate whether the Defendants using false or misleading statements in their Welcome Email have caused their customers to stop making payments to their timeshare company.
>
> Is that an accurate description of what you were asked to do by Plaintiff's counsel in this case.
>
> A: Yes, it's an accurate description.
>
> * * *
>
> A: I have not been asked to test anything related to the script or the video presentation in the survey.

(Exhibit B at 45:15-22; 106:22-23).

However, Mr. Stec has testified that he reviewed approximately 113

different Welcome Emails, and each of them are different:

> Q:     So, in the course of forming your opinions, how many welcome emails – how many different versions of Welcome Emails did you review?
>
> A. . . I think I say 131.
>
> . . .
>
> A:     I don't believe, to the best of my recollection, that each email was identical.

14

A:      It was 113.

(Exhibit B at 48:17-24; 49:8-9; 49:24). Despite the over 113 different Welcome Emails, Mr. Stec utilized a version of a Welcome Email provided to him by Plaintiffs' counsel that contains the following text:

> Please keep in mind that you will still receive statements, letters, and emails from the Resort or the Collections department requesting for payments, changes to your account, requesting for you to update your information, and special offers that you may receive to remove yourself out of your contract due to our attorney's contact. Depending on the situation, we suggest not to make those payments to the Resort, so please confirm with me before making your decision. Any bills, letters, or emails you receive, please forward those over to me so that I can add those to your file.

(Exhibit A at 10)(Exhibit B at 50:10-13).  According to Mr. Stec: "Counsel indicated to [him] what the alleged false or misleading statements were – what the accused statements were, essentially – so, they identified this excerpt for me." (Exhibit B at 50:14-19).

To the extent Plaintiffs intend to utilize Mr. Stec's opinion and testimony to prove their Lanham Act claim, the Welcome Email cannot be "commercial speech" under the Lanham Act if it is not designed to influence the audiences' decision to purchase goods or services.[5] Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1349 (11th Cir. 2012)("they must be: (1) commercial speech; (2) by a

---

[5]      During the Local Rule 3.01(g) meet and confer conference, there was discussion amongst counsel regarding whether Plaintiffs' intend to offer Mr. Stec's opinion for purposes of Plaintiffs' Lanham Act claim.  It remains unclear and, out of an abundance of caution, Mr. Sussman makes the argument set forth herein

defendant who is in commercial competition with plaintiff; (3) **for the purpose of influencing consumers to buy defendant's goods or services.** While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.")(citing <u>Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. of Physics</u>, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994)) (emphasis added).

Here, Mr. Stec opined that the Welcome Email is sent to the Timeshare Owner <u>after</u> they attend a presentation or video conference and had already decided to hire TET:

> 28. It is my understanding that **after** <u>a customer</u> attends a presentation or video conference and <u>chooses to hire Timeshare Exit Teams</u> services, they are sent a Welcome Email by the Timeshare Exit Team.
>
> * * *
>
> Q:     You told me a minute ago that the only statements that you tested in the survey were the statements in the email.
>
> A:     That's correct . . .
>
> Q:     Okay.  And it's your understanding that the email was sent to timeshare owners **after** they had already retained Reed Hein?
>
> A:     I believe that's accurate

(Exhibit A at 9)(Exhibit B at 63:8-18). Accordingly, as the Welcome Email was sent to Timeshare Owners <u>after</u> they retained TET's services, it cannot be argued that

the Welcome Email is commercial speech, for purposes of a Lanham Act claim. Furthermore, as TET services were already retained – for purposes of exiting the Timeshare – at the time the Timeshare Owners received the Welcome Email, it cannot be argued that the Welcome Email caused the Timeshare Owners to "breach" their contracts with Plaintiffs.  This is particularly so when the surveyed persons had hired no one and were entertaining a hypothetical circumstance which had no real consequences for them. Accordingly, Mr. Stec's opinion and testimony would not assist the trier of fact in making a determination as to any issue in this case.

At the June 24, 2021 hearing in this matter, and based on Plaintiffs' response to Mr. Sussman's Motion to Compel, there was discussion that only oral sales presentations are at issue for purposes of Plaintiffs' claims against Mr. Sussman. (See Doc. # 267 at 4"Wyndham has identified the advertising to which it contends Sussman contributed, i.e., the oral sales presentations). If Plaintiffs' claims against Mr. Sussman are based solely on oral presentations, [6] and Mr. Stec did not analyze

---

[6]     On May 13, 2021, Plaintiffs filed a Partially Unopposed Motion for Enlargement of Case Management and Scheduling Order arguing that additional time was needed in light of the "recent production of over 263,000 telephone call recordings." Plaintiffs further requested the expert discovery be re-opened on a limited basis to permit Plaintiffs the opportunity to explore and to disclose any additional expert reports, as appropriate, related to the late-produced recordings. In the Motion, Plaintiffs represented that "based on Wyndham's analysis to date . . . what is clear is that, among these records are audio recordings of TET's sales presentations to timeshare owners, which are crucial evidence in this case, as TET's standard oral sales presentations are actionable under the Lanham Act just as any other adverting would be . . . There can be no better evidence of what TET

the effect on consumers of any oral sales presentations, then Mr. Stec's opinion is irrelevant to the claims at issue.   Considering Plaintiffs' claims for tortious interference and those under the Lanham Act are not brought in the alternative, and that both require a showing that Defendant caused Owners to breach their contracts, the only logical conclusion is that the oral sales presentations were the procuring cause of the tortious interference Plaintiffs' allege.

Accordingly, given Plaintiffs' representation, any testimony by Mr. Stec would not assist the trier of fact, but rather would confuse the jury and result in prejudice towards Mr. Sussman.

Even if Plaintiffs do not intend to limit themselves to oral sales presentations, allowing Mr. Stec's testimony and survey results would be misleading, as he admittedly only tested the Welcome Email. Mr. Stec did not test the oral sales presentations, scripts, website, *etc.* (See Fed. R. Evid. 401; Fed. R. Evid. 703 "But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.")

---

routinely said to timeshare owners during the sales presentations than verbatim recordings of the sales presentations themselves." (Doc. # 257). Despite Plaintiffs knowledge of the oral sales presentation, Plaintiffs withdrew this Motion and all relief requested therein, never produced the oral sales presentations, and have never supplemented Mr. Stec's expert report (or disclosed any additional expert). See Suntree Technologies, Inc., 693 F.3d 1338 ("Sun tree also failed to present any evidence that the brochure was actually disseminated to any potential customers.").

C. **Reliance on Education and Experience**

According to his Report, in order to form his opinions, Mr. Stec has:

> 3. . . . considered the documents listed in Exhibit 3 or referenced in the text, footnotes, and attached exhibits to this report. **I have also relied on my education, professional judgment, and expertise gathered from many years of conducting and critically evaluating survey research.** The following report summarizes my current opinions. I reserve the right to use demonstratives at trial based upon my report and associated exhibits. The information in the report is based upon discovery to date and the information that is currently available. To the extent additional information is produced or relied upon, I may supplement the report, if warranted, based on the additional discovery.

(Exhibit A at 1)(emphasis added).

Mr. Stec does not cite to any publications, peer reviewed articles, or data, which indicates that his opinions, or the methodology he utilized in formulating them, are scientifically reliable. To the extent, Mr. Stec relies on his experience in the field that alone – without more – is insufficient to qualify under a Daubert analysis. See Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc., No. 6:03-cv-1860ORL19KRS, 2005 WL 2465020, at *7 (M.D. Fla. Oct. 6, 2005)("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

**D. <u>Any Marginal Relevance is Substantially Outweighed by the Prejudice to
Mr. Sussman</u>**

Mr. Stec – by his testimony and report – proves nothing. First, Mr. Stec
presumed the Welcome Email language was false and misleading, but he was
purportedly retained by Plaintiffs to prove as much. At best, Mr. Stec's report
suggests that the Welcome Email had some influence on the Timeshare Owners'
(who received the Welcome Email) decision to breach their contracts, but whether
they were "led" or "mislead" is in no way demonstrated by this report.  Put
another way, Mr. Stec's testimony and report does not demonstrate "'that a
statistically significant part of the commercial audience holds the false belief
allegedly communicated by the challenged advertisement.'" <u>Miller's Ale House,</u>
<u>Inc. v. Boynton Carolina Ale House, LLC</u>, 745 F. Supp. 2d 1359, 1377 (S.D. Fla.
2010)(quoting <u>Johnson & Johnson v. Smithkline Beecham Corp.</u>, 960 F.2d 294, 298
(2d Cir. 1992)).  In other words, the Court can only conclude that the consumer
was **misled** to breach if that decision was based on some false belief put in the
mind of the consumer by the Welcome Email.

For those Owners who did not receive the Welcome Email utilized in the
consumer behavior survey, Mr. Stec's testimony and report are inapplicable and,
thus, irrelevant. Thus, Plaintiffs offering (and the Court allowing) Mr. Stec's
report/testimony for certain Owners and then requiring the trier of fact to

disregard such testimony for the other Owners (but simultaneously advise the best evidence of the Owners conduct is the Owners' fact-based testimony), is confusing and unhelpful to the trier of fact.

Furthermore, Mr. Stec did not engage in any analysis that shows the Welcome Email was actually misleading, rather than purely informative. One would expect that Plaintiffs would have had Mr. Stec analyze whether the consumer's decision to breach was "safe" "legal" or "without any negative consequence," or the like considering these feature prominently in the Amended Complaint (See, e.g., Doc. 63, ¶¶ 5, 96, 97) whereas the oral sales presentations and Welcome Email are conspicuously absent. Instead, Mr. Stec limits his analysis that the decision to breach is based on an allegedly false impression given to them by the Welcome Email. It would be unreasonable to conclude, however, that a statement that expressly tells the customer to "*confirm with me before making your decision*" whether or not to breach can be construed as an explicit instruction to *cause consumers to breach*. In fact, the Welcome Email language specifically avoids telling the owner what to do because whether they will be advised to stop paying will be the subject of a later discussion:

> **Depending on the situation**, we suggest not to make those payments to the Resort, so please confirm with me before making **your decision**.

(Exhibit A at 10)(emphasis added). Mr. Stec's report does not explain what false belief is established in the mind of the consumer that caused them to breach, only

that the Welcome Email tended to cause them to feel more inclined to breach, and then only 18.5% were so influenced.

"Generally, before a court can determine the truth or falsity of an advertisement's message, it must first determine what message was actually conveyed to the viewing audience. Consumer surveys supply such information. Once the meaning to the target audience has been determined, the court, as the finder of fact, must then judge whether the evidence establishes that they were likely to be misled." Johnson & Johnson v. Smithkline Beecham Corp., 960 F.2d 294, 298 (2d Cir. 1992)(internal citations and quotations removed). The Stec report identifies the language of the Welcome Email (both the control and treatment groups), but fails to identify what message was "actually" conveyed, as discussed in Johnson & Johnson. Presumably Plaintiffs will ask the Court (and the trier of fact) to conclude that although the literal message is "don't breach yet" it was misleading because the "actual" message was "breach right now." This is an unsupported and unreasonable interpretation.

In sum, Mr. Stec's testimony would not assist the trier of fact, but rather it would confuse the trier of fact as to the findings which they are requested to make. The marginal relevance – if any – of Mr. Stec's testimony, would, therefore, be substantially outweighed by the prejudice to Mr. Sussman.

WHEREFORE, for the foregoing reasons, Defendant, MITCHELL R. SUSSMAN, respectfully requests that this Court exclude the opinions of Plaintiffs' Expert, Jeffery A. Stec, Ph. D., and strike him from testifying as an expert witness on the Plaintiffs behalf.

**Certification of Counsel Pursuant to M.D. FLA. L.R. 3.01(g):** Undersigned counsel conferred with Plaintiffs' counsel via telephone, who advised he opposes the relief sought herein.

Date:  July 30, 2021

Respectfully Submitted,

*/s/ John J. Bennett*
Michael A. Nardella, Esq.
Florida Bar No. 051265
John J. Bennett, Esq.
Florida Bar No. 98257
Nardella & Nardella, PLLC
135 W. Central, Suite 300
Orlando, Florida 32801
(407) 966-2680
mnardella@nardellalaw.com
jbennett@nardellalaw.com
service@nardellalaw.com

*/s/ Clay H. Howard*
Clay H. Coward, Esquire
Florida Bar No. 379522
Krista N. Cammack, Esquire
Florida Bar No. 104718
WICKER SMITH O'HARA MCCOY & FORD, P.A.
Attorneys for Mitchell R. Sussman
390 N. Orange Avenue, Suite 1000
Orlando, FL 32801

PH:  407-843-3939
ccoward@wickersmith.com

*Counsel for Defendant Mitchell Reed Sussman*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system on July 30, 2021, and the foregoing document is being served this day on all counsel or parties of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

*/s/ John J. Bennett_____*

24