UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| WYNDHAM VACATION OWNERSHIP, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>REED HEIN & ASSOCIATES, LLC d/b/a TIMESHARE EXIT TEAM, *et al.*,<br><br>Defendants. | Case No.: 6:18-cv-02171-Orl-31DCI |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO STRIKE EXPERT OPINION AND TESTIMONY OF JEFFERY A. STEC, PHD.**

Plaintiffs (collectively, "Wyndham"), hereby respond in opposition to the *Motion to Strike and Exclude Testimony of Plaintiffs' Expert Dr. Jeffery A. Stec, Ph. D.* (Doc. 301) (the "Motion") filed by Defendant, Mitchell R. Sussman, Esq. d/b/a The Law Offices of Mitchell Reed Sussman & Associates ("Sussman").

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), it is proper to admit the expert opinion of Dr. Jeffrey A. Stec, Ph.D. ("Dr. Stec") who performed a consumer survey to test co-Defendant Reed Hein & Associates, LLC d/b/a Timeshare Exit Team's ("RH") advertising and customer communications. Accordingly, the Court may deny the Motion.

**I.     FACTUAL BACKGROUND**

Sussman is an attorney vendor in partnership with RH; DE 290, Ex. B; who markets services that purport to offer timeshare owners a means to

1

terminate their timeshare contract. DE 209, Ex. F. As stated in Wyndham's *Amended Complaint*, Sussman contributed to RH's advertising and, through RH, interfered with Wyndham's contracts with its customers. DE 63.

RH obtains customers through an advertising effort that includes oral sales presentations to the timeshare owners. DE 209, Ex. F. Discovery has revealed that, after retaining RH, a portion of such owners received from RH an email welcoming them as customers (the "Welcome Email"). Included in such Welcome Email is the following language (the "Tested Language"):

> Please keep in mind that you will still receive statements, letters, and emails from the Resort or the Collections department requesting for payments, changes to your account, requesting for you to update your information, and special offers that you may receive to remove yourself out of your contract due to our attorney's contact. Depending on the situation, we suggest not to make those payments to the Resort, so please confirm with me before making your decision. Any bills, letters, or emails you receive, please forward those over to me so that I can add those to your file."

Report, ¶ 28.

Wyndham retained Dr. Stec to test the impact of RH's overall marketing efforts and the specific Tested Language. On Feb. 1, 2021, Wyndham served a copy of the *Expert Report of Jeffery A. Stec, Ph.D.* ("Report") (**Exhibit A**) on defendants which outlined Dr. Stec's opinions and methodology. The Report states that RH's "practices are likely to cause a consumer to stop making payments to their timeshare company." Report, p. 3. Dr. Stec conducted a

2

consumer survey to reach this opinion. *Id.* Thereafter, the defendants deposed Dr. Stec on March 9, 2021. Dep. of Jeffery A. Stec., Mar. 9, 2021 ("Stec Dep.").

## II. LEGAL STANDARD

"[E]xpert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*'; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014). A non-exhaustive list of *Daubert* factors; *see United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013); "do not constitute a definitive checklist or test" for reliability "and the gatekeeping inquiry must be tied to the particular facts…Those factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999). Whether expert opinion will "assist the trier of fact" is "geared towards ensuring that the expert testimony is relevant, in addition to being reliable…To satisfy this Daubert requirement, expert testimony must be relevant to an issue in the case and offer insights beyond the understanding and experience of the average citizen." *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 390 (M.D. Fla. 2018) (quotation omitted).

3

## III. ARGUMENT

The Motion fails to articulate sufficient basis to exclude Dr. Stec's opinions, as stated in the Report. Specifically, each of the three *Daubert* elements for admission of Dr. Stec's opinions are satisfied and the Motion fails to offer any sufficient objection. *See Chapman,* 766 F.3d at 1304.

First, the Motion concedes that Dr. Stec is qualified to testify regarding the subject matter of the Report. *Mot.*, p. 3. Thus, this element is met. *See Chapman,* 766 F.3d at 1304. As to the remaining elements, Dr. Stec engaged in reliable methodology to reach his opinions which are relevant to Wyndham's Lanham Act and tortious interference claims. Thus, Dr. Stec's opinions are admissible. The Motion offers no credible challenge to such admission. To the extent that Sussman's arguments can be properly placed within *Daubert's* analytical structure, they fail to adequately dispute the admissibility of Dr. Stec's opinions. The Motion should be denied.

### A. Dr. Stec's Methodology is Reliable

Dr. Stec employed a reliable methodology. The Motion articulates only minor grievances with Dr. Stec's method of analysis. *See* Mot. Those complaints are without merit and should be ignored.

#### *1. Dr. Stec Employed a Reliable Methodology*

First, Dr. Stec conducted a reliable survey. In fact, Dr. Stec actually conducted two reliable surveys—a treatment and a control survey.

4

Both surveys guided respondents through identical versions of RH's advertising content. Treatment respondents were then shown the actual Welcome Email (including the Tested Language), while control respondents were shown a version without such language. After viewing the Welcome Email, respondents in both surveys[1] were asked identical questions. The treatment survey had 249 respondents while the control survey had 250 respondents. Report, ¶ 60. The only difference was inclusion of the Tested Language. *Id.* at ¶ 44. Dr. Stec compared responses from the surveys to draw his conclusions. Stec Dep. 101:20-102:9. "[S]ince the survey respondents have been assigned randomly to the two groups and you're showing them potentially the same things but for what you want to test, and you're asking them the same questions, any differences between those questions -- the percentages, for example, from the responses to those questions -- would be attributable to that which differs across the two surveys…" *Id.* at 102:1-8. Different responses are; therefore, attributable to the differences between the surveys. *Id.* Thus, the inclusion of the Tested Language drove differences in the responses. *Id.*

The Motion does not challenge Dr. Stec's approach. *See* Mot. At most, the Motion limits its challenges to (a) whether the survey universe was appropriately formed; and (b) whether Dr. Stec was entitled to rely on his

---

[1] In fact, both surveys were double-blind surveys where neither the respondent nor the data collection organization were aware of the purposes of the research. Report, ¶ 29.

5

education or experience. Both challenges fall short.

### 2. *Dr. Stec's Opinion Relies on Proper Sample Universe*

Rather than actually challenge the survey methodology, Sussman argues that Dr. Stec's opinions are inadmissible because he did not survey the actual timeshare owners at issue in this case. This argument fails.

#### a. Sample Universe Does Not Impact Admissibility

As a threshold matter, the sample universe is not relevant to the admissibility of the survey. *See e.g. Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, No. 8:12-CV-01479-T-27, 2014 WL 2625297, at *2–3 (M.D. Fla. Jun. 12, 2014); *Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1374 (N.D. Ga. 2010). Rather, this speaks to the weight the survey should be given. *See id.* In *Pods*, this Court stated that any "[s]uch technical deficiencies go to the weight of [the expert's] opinions, not their admissibility." 2014 WL 2625297, at *3. Accordingly, even if concern about the sample size is valid—which it is not—such concerns are not appropriately applied to the question of the *admissibility* of the expert opinion. *See Pods*, 2014 WL 2625297, at *2–3 (M.D. Fla. Jun. 12, 2014); *Atlanta Allergy*, 685 F. Supp. 2d at 1374. Thus, the Court should disregard this argument for purposes of the instant *Daubert* challenge. *See id.*

#### b. The Sample Universe is Appropriately Tailored

Dr. Stec's sample universe is; however, proper. To be appropriate, a

survey's sample universe "need only reflect a 'fair sampling' of the relevant population." *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 499 (S.D. Ohio 2020).

The "target population for this study was timeshare membership owners in the United States." Report, p. 11. This population represented "[c]ustomers or potential customers of the—essentially, of the Defendant's services or services like that." Stec. Dep. 71:4-6. Dr. Stec felt this was the appropriate target population "[b]ased on other surveys that I've done in the context of false advertising, or false or misleading statements, [and] my general understanding of accepted practices in the practice area." *Id.* at 71:13-18.

Sussman's only complaint as to the survey universe is that it should be further narrowed to just those owners at issue in this case. Mot., pp. 5-13. That is, "it does not address the fact-based inquiry required for each Owner, as it relates to whether or not the 'false and misleading statements in the Welcome Email have caused their customers to stop making payments to their timeshare company.'" *Id.* at p. 13. Dr. Stec testified that a narrower population (such as proposed by Sussman) would be improper for his survey as it "doesn't necessarily get prospective customers." Stec. Dep., 88:5-6.[2]

Further, Sussman's argument is founded on the mistaken argument that

---

[2] It stands to reason that adopting Sussman's proposed population would skew the results—possibly in Wyndham's favor—as such population would be only those who saw the tested content and actually decided to cease payment.

7

only direct evidence related to the specific at-issue owners is appropriate (if the surveys were restricted to only the specific owners at issue in this case, it would be direct evidence of such owners' interpretation of the Tested Language). This is a fundamental misunderstanding of the law. Despite Sussman's argument to the contrary; Mot., p. 9; evidence relevant to Wyndham's claims is not limited to direct evidence. That argument is based on an incorrect reading of *Westgate Resorts, Ltd. v. Sussman*, 2019 WL 3848805, *2 (M.D. Fla. July 26, 2019), *reconsideration denied*, 2019 WL 3836534 (M.D. Fla. Aug. 15, 2019).

Rather than mandate direct testimony, the Court in *Westgate* found that the plaintiffs in that particular case failed to offer *any* other competent evidence on causation leaving direct testimony as the only option. The Court later stated that "Plaintiffs missed the boat on establishing causation…by presenting statistical information, and their remaining evidence doesn't speak to these owners' circumstances surrounding their non-payments, all that's left to prove up their claim is direct evidence from the owners…We're at this point because of how Plaintiffs pled, approached, and litigated this case. Their strategy." *Westgate*, 2019 WL 3836534, at *3. Adding that there are "any number of things" a plaintiff could use as deposition substitutes. *Id.* at *5, n.3.

Recently, the Court re-affirmed that *circumstantial* evidence like this can support causation. *See Westgate Resorts, Ltd. v. Reed Hein & Assocs., LLC*, 2020 WL 674108, *3 (M.D. Fla. Feb. 11, 2020), *vacated on other grounds*, 2020

8

WL 3265972 (M.D. Fla. Apr. 27, 2020). If the Court were to impose a strict standard requiring direct evidence, this ruling would be meaningless. *See id.* It would also disregard the nuances that the Court drew in *Westgate v. Sussman* to highlight that the requirement for direct testimony was a result of plaintiffs' failure to offer anything else. *See* 2019 WL 3836534, at *3, 5.

Thus, Dr. Stec's opinions are reliable and may assist the Court; *see infra* § III.B; despite not surveying the actual owners at-issue.

### 3. *Dr. Stec Did Not Rely Only on Experience*

Sussman further challenges reliability challenge on a false contention that Dr. Stec relied solely on his education and experience. This argument is factually incorrect and legally deficient.

First, Dr. Stec *does not* rely only upon his experience. Rather, Dr. Stec relies upon the consumer survey described in the Report that was custom-designed for the facts of this case. Report, ¶ 29-31. The Report states that Dr. Stec "reached [his] opinion based on the survey I have conducted and the results of that survey." *Id.* at ¶ 12. Indeed, Sussman acknowledges that Dr. Stec conducted a survey to reach his conclusions. *See* Mot, p. 4.

Second, the Report includes reference to data. Sussman complains that the Report does not cite to "any publications, peer reviewed articles, **or data**, which indicates that his opinions, or the methodology he utilized in formulating them, are scientifically reliable." Mot., p. 19 (emphasis added).

9

The Report attaches as exhibits the results (Exhibit 9) and data (Exhibit 10) obtained through the survey. Indeed, Exhibit 10 is a data table seventy-five (75) pages long. To the extent Sussman contends that the opinion is unreliable because it fails to rely on data, that argument is factually inaccurate. *See id.*

Finally, the requirement for publications or peer-reviewed articles is more important where—unlike here—an expert is truly relying only upon experience alone. *See Simmons v. Fla. Dep't of Corr.*, No. 5:14-CV-438-OC-39PRL, 2016 WL 7116000, at *4 (M.D. Fla. Apr. 20, 2016). ("An expert's testimony may by supported by documentary evidence, such as peer-reviewed articles or scientific studies or testing, where the expert conducted no studies or testing on his or her own.") As stated; however, Dr. Stec's opinions are based not just on his experience, but on data gathered through his consumer survey and results of that survey which was custom-tailored to the facts of this case. Report, ¶ 29-31.

### 4.   *Other "Methodology" Argument is Misplaced*

Another argument in the Motion labeled as a challenge to the methodology is, actually, a challenge to whether the survey results will help the Court. Specifically, Sussman states "Mr. Stec did not engage in a statistical analysis…" Mot., n. 2. True—but irrelevant. Sussman argues that "only a further probabilistic analysis" rather than the Stec survey "can show that the correlation is applicable to a broader pool – such as timeshare Owners here –

10

from which it would be appropriate to infer causation." *Id*. Not only is this statement of counsel unsupported by any legal source; *id*.; but it is misplaced within Sussman's *Daubert* challenge. This argument, at best, speaks not to the survey reliability, but instead to whether the survey that Dr. Stec performed will assist the Court in this matter. Of course, there too the argument fails; *see infra* § III.B; as the results serve a discrete purpose in this matter.

Accordingly, the Motion fails to articulate any deficiencies in the survey methodology that warrant excluding Dr. Stec's expert opinion.

### B. Dr. Stec's Opinions Assist the Trier of Fact

Dr. Stec's opinions will assist the trier of fact as they are relevant to Wyndham's Lanham Act (Count II) and tortious interference (Counts IV and VI) claims. The Report demonstrates that Dr. Stec will provide insight into consumer understanding of RH advertising and whether RH's practices caused timeshare owners to cease payment to Wyndham. At best, the Motion argues that Wyndham should have retained an expert to perform some other form of analysis. For the actual expected use of the Report; however, Dr. Stec's opinion will assist the trier of fact, which is what is at issue.

#### *1.   Dr. Stec's Opinions Are Admissible as Related to Contributory False Advertising*

Dr. Stec's opinions are admissible as it relates to the elements of causation as to Wyndham's contributory false advertising claim against

11

Sussman. Specifically, the Report is relevant to show consumer impression as to the totality of RH's advertising.

Dr. Stec's survey presented respondents with a "webpage that Timeshare Exit Team customers would typically see when shopping for and soliciting the services of Timeshare Exit Team. Additionally, the survey showed respondents a sales video presentation that these customers would see if they inquired about hiring Timeshare Exit Team." Report, ¶ 30. The Report revealed that even respondents from the *control group that did not see the Tested Language* took away the impression that they should cease payment. *Id.* at ¶ 62. This assists the trier of fact in understanding how the overall advertising would impact its audience. Moreover, this conclusion is based on the entirety of the sales presentation shown to respondents, not just the Tested Language of the Welcome Email. Accordingly, Sussman's argument that the Welcome Email is not actionable under the Lanham Act; Mot., pp. 15-18; is incorrect.

### 2. *Dr. Stec's Opinions Are Admissible as Related to Tortious Interference.*

Dr. Stec's opinions are admissible as it relates to the elements of causation in Wyndham's tortious interference claims (Counts IV and VI) for those Wyndham Owners who received the Welcome Email.[3]

The elements of tortious interference are "(1) the existence of a contract;

---

[3] Wyndham does not intend to offer Dr. Stec's opinion in support of its tortious interference claim as it relates to any Wyndham Owner that it cannot show received the Welcome Email.

12

(2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) absence of any justification or privilege; and (5) damages resulting from the breach." *Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1349 (M.D. Fla. 2019). There is no dispute as to the existence of contracts, Sussman and RH's knowledge of those contracts, the timeshare owners' breaches of those contracts, and the resulting damage to Wyndham flowing from those breaches. *See Motion for Summary Judgment Filings*, DE Nos. 287, 290, 313, 314. Contested issues at trial will revolve centrally around the issue of causation. *See id.* Dr. Stec's opinions are relevant to, and will assist the trier of fact, in regard to this element.

First, survey results show the real-world understanding of the Welcome Email. According to the Report, "50.2% of respondents indicated the [Welcome Email] stated or implied that they should stop making payments on their timeshare." Report, ¶ 12. After controlling for "pre-existing beliefs, guesses, and other background noise," i.e., information provided by the control survey, Dr. Stec was able to conclude that "32.2% of respondents believed the alleged false and misleading statements in the Welcome Email sent by Timeshare Exit Team told them to stop making payments to the timeshare company." *Id.* In short, one out of every three survey respondents took from the Welcome Email the message that they should stop making payments. *Id.*

Second, the survey shows how that message impacts real-world decision-

13

making. Dr. Stec also tested *what action* survey respondents would take. In this regard, "18.5%" of the respondents "were either Very Likely or Somewhat Likely to stop making payments to their timeshare company *due to the alleged false and misleading statements in the Welcome Email*." *Id.* (emphasis added). In short, nearly one in five survey respondents would stop payment to their timeshare developer because of their Tested Language. *Id.*

This is helpful as such evidence provides additional reason for the trier of fact to determine that the breaches in question were caused by RH/Sussman. For reasons described above; that this is not direct evidence from the specific owners is insufficient to discount its relevancy. *See, supra* § III.A.2.b.

Usefulness of the survey results also increases when the results thereof are reviewed alongside real-world conditions. Wyndham identified 210 contracts where the related owner was a RH customer *and* appears to have received the Welcome Email with the Tested Language. Table at **Exhibit B.** Of this sub-set, such owners ceased payment as to 81 of these contracts **on the very next payment**. *Id.* Thus, 38% of observed contracts became delinquent immediately after exposure to the Tested Language. *Id.* These numbers, combined with Dr. Stec's survey, allow Wyndham to argue that the Tested Language increased the likelihood than an owner would cease payment to their timeshare developer upon receipt. Such information assists the trier of fact in determining tortious interference causation.

14

### 3. *Dr. Stec's Opinions Are Not Intended to Extrapolate to the Entirety of the Wyndham Owner Population.*

Sussman asserts that Dr. Stec performed no "analysis which permits the trier of fact to extrapolate his findings to them." *Motion*, p. 10. But in so arguing, Sussman misconstrues the purpose of Dr. Stec's survey, likely because he is trying to shoe-horn Dr. Stec's survey into the same category as the survey conducted by Dr. Charles Cowan, Ph. D., in the *Westgate v. Reed Hein* matter. The surveys, however, are completely distinct.

Dr. Cowan attempted to survey the Westgate timeshare owners that had retained RH. He requested that Westgate provide him with 100 respondents, and ultimately, they only provided him with 43 owners who defaulted after hiring RH. Case No. 6:18-cv-01088, Doc. No. 208, pp. 5-6. For those 43, Westgate's counsel, not Dr. Cowan, determined that only 22 survey responses were "influenced" (owners that ceased payment because of defendant's conduct), i.e., 50%. *Id.* at p. 6. Dr. Cowan then attempted to extrapolate percentage to the entire population of Westgate timeshare owners. *Id.* at p. 3.

The Court found two major problems with Dr. Cowan's opinion (neither of which is present here). First, because only 43 of the necessary 100 survey respondents were obtained, Dr. Cowan was only able to opine that RH had caused somewhere between $1,952,391 and $5,230,747 in damages, without being able to guide the jury in selecting any particular number. *Id.* at p. 7.

Second, the 43 survey responses were categorized by counsel, rendering the opinion unreliable. *Id.* Based on these defects, the Court excluded Dr. Cowan's opinion. *Id.* at p. 9.

None of the issues related to Dr. Cowan's opinion are at issue here. First, as Sussman himself notes, Dr. Stec did not engage in a survey of RH customers; he engaged in a survey of the timeshare owning public. Thus, Dr. Stec's methodology was entirely different and his opinions do not seek to superimpose a set percentage of survey respondents onto RH's customers. Second, Dr. Stec's categorization and analysis of the survey responses was entirely his own. *See* Report. Wyndham's counsel had no influence on the analysis or conclusions. Sussman presents no evidence or argument to the contrary. *See* Mot.

### 4. *Test of Welcome Email Assists the Court*

The Report properly tested the Welcome Email. Sussman criticizes Dr. Stec's decision not to test other portions of the stimuli presented to survey respondents. Mot., pp. 14-18. Dr. Stec's analysis; however, is sufficient to assist[4] the trier of fact's analysis of Wyndham's tortious interference claim.

First, whether the Welcome Email is actionable under the Lanham Act; *See* Mot., p. 15-18; does not determine admissibility where there is an

---

[4] It is unclear whether Sussman also contends that this impacts reliability of the survey. Testing only one variable; however, increases the reliability of the results rather than the opposite. A single variable allows Dr. Stec to opine that any differences in the respondents' answers were caused by that variable alone. Stec Dep. 101:20-102:9.

16

independent basis to admit the opinions in support of Wyndham's tortious interference claims. *See* Fed. R. Evid. 401; 702. For the reasons stated above, the Report is relevant to adjudication of Wyndham's tortious interference claim. *See, supra*, § III.B.2. That is sufficient. *See* Fed. R. Evid. 401; 702.

Second, the timing of when RH delivered the Welcome Email to timeshare customers does not remove the email from consideration in connection with Wyndham's tortious interference claims. Sussman makes an unsupported argument that the Welcome Email is irrelevant to the tortious interference claims because it is sent after the owners retain RH. Mot., p. 17. Accordingly, Sussman asserts, the email may not contribute to any decision to "breach" their contracts. *Id.* However, this argument conflates an owner's desire to end the timeshare contract with a decision to breach that contract. This distinction was addressed in *Westgate v. Reed Hein* where the Court rejected a similar argument by RH finding that hiring RH did not establish any predisposition to breach noting that "wanting to 'exit' or 'renegotiate' a contract is not at all the same thing as intending to breach it." 2020 WL 674108, at *3. Accordingly, that the owners had already decided to retain RH when they received the Welcome Email does not speak to whether they had already decided to breach the contracts by non-payment such that the Welcome

17

Email may have less influence.[5]  *See id.*

Thus, Dr. Stec's test of the Welcome Email assists the trier of fact.

### 5. *Dr. Stec's Opinions Do Not Prejudice Sussman*

Finally, the Motion challenges the usefulness of Dr. Stec's opinions by stating that they would prejudice Sussman. Mot., pp. 20-23.

First, there is no prejudice should the Report fail to reach certain portions of Wyndham's claims. Sussman appears to argue that the Report fails to illuminate whether certain statements of the Welcome Email were false; Mot., p. 20-22; or whether a commercial audience holds a certain false belief. *Id.* at p. 20.  Assuming this is the argument made in the Motion, and that it is true, there is still valid basis to admit the opinion for the reasons referenced above.  *See, supra* §§ III.B.1-2, 4; *see also* Fed. R. Evid. 401; 702.  It should not be expected that expert opinion reaches every element of a party's claims.

Second, there is no prejudice that Dr. Stec's opinions may be applicable to certain of the owners and not others. This claim of prejudice is entirely reliant on argument of counsel.  Mot, pp. 20-21.  Indeed, the very jury instructions that Sussman cites contemplates that plaintiffs may provide evidence that applies to some—but not all—applicable contracts. The instructions state that the jury should "consider these factors for each

---

[5] Wyndham would only apply Dr. Stec's opinion to those contracts that became delinquent after receipt of the Welcome Letter.

18

contract…That is, your decision on one…owner's contract should not influence your decision on whether TET tortiously interfered with [plaintiff's] contract with another owner. Mot., p. 7. The instructions continue that the plaintiff "does not need to provide its claims with respect to each and every contract. If there is sufficient proof relating to even just one contract, then your verdict should be for [plaintiff] and against TET." *Id.* Similar language is offered as to claims under the Florida Deceptive and Unfair Trade Practices Act. *Id.* at pp.7-8. Thus, regardless of whether the Court admits Dr. Stec's opinion, the jury will have to determine whether Wyndham provided sufficient evidence as to individual contracts. *See* Mot. pp. 7-8.

Finally, Sussman offers no explanation how Dr. Stec's analysis of consumer reaction to RH's Welcome Email would be prejudicial simply because Sussman considers certain consumer reaction unreasonable. The Motion points to language in the Welcome Email that, Sussman contends, directs owners *not* to breach their contracts; Mot., p. 21; and argues that because of such language it would be "unsupported and unreasonable" for the Court to consider the Welcome Email as capable of influencing an owner's decision to stop payment. Mot., p. 22. Of course, the purpose of Dr. Stec's study is to scientifically understand consumer reaction to the *entire* Welcome Email— inclusive of the parts Sussman highlights—rather than rely on competing guesses of counsel as to how component parts *may* influence consumers. The

19

survey inherently accounts for any impact of the supposedly curative statements highlighted in the Motion. *See* Stec Dep. 101:20-102:9. Notably, the Motion offers no explanation how this leads to any prejudice. *See Mot.*, pp. 20-22.

### C. Wyndham Has Not Abandoned Its Contributory False Advertising Claim.

Contrary to Sussman's representation, Wyndham's counsel has made no representation regarding abandonment of Count II of the Amended Complaint for Contributory False Advertising. Clearly, Wyndham does intend to offer Dr. Stec's opinions in relation to this claim.

WHEREFORE, the Court should deny Sussman's Motion in its entirety.

*/s/ Glennys Ortega Rubin*
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**CHRISTIAN M. LEGER, ESQ.**
Florida Bar No. 0100562
cleger@shutts.com

**SHUTTS & BOWEN LLP**
300 South Orange Avenue
Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755

**ERIC C. CHRISTU, ESQ.**
Florida Bar No. 434647
ecchristu@shutts.com
*Attorneys for Plaintiffs*

**SHUTTS & BOWEN LLP**
525 Okeechobee Boulevard
Suite 1100
West Palm Beach, FL 33401
Telephone: (561) 835-8500
Facsimile: (561) 650-8530

ORLDOCS 18946219 4