# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

WYNDHAM VACATION OWNERSHIP, INC., WYNDHAM VACATION RESORTS, INC., WYNDHAM RESORT DEVELOPMENT CORPORATION, SHELL VACATIONS, LLC, SVC-WEST, LLC, SVC-AMERICANA, LLC and SVC-HAWAII, LLC,

    Plaintiffs,

v.                                                            Case No:   6:18-cv-2171-GAP-DCI

MITCHELL R. SUSSMAN,

    Defendant.

## ORDER

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment (Doc. 290) and Defendant's Motion for Summary Judgment (Doc. 287). In ruling on these motions, the Court considered the parties' responses (Docs. 313 & 314) and their replies (Docs. 321 & 322).

    **I.**    **Background**

Plaintiffs (hereinafter, "Wyndham") are a group of associated entities engaged in the business of developing and selling timeshare properties. Defendants Reed Hein & Associates, LLC d/b/a Timeshare Exit Team ("TET"),

Happy Hour Media Group, LLC, Brandon Reed, Trevor Hein, and Thomas Parenteau (collectively, the "TET Defendants"), are in the business of helping timeshare owners get out of their timeshare obligations.[1]

In soliciting clients, TET engages in online advertising and oral sales pitches to timeshare owners to convince them to sign up for TET's service. TET contracted with Defendant Mitchell Sussman ("Sussman"), an attorney, to assist it with making good on its promises to timeshare owners. TET would refer owners to Sussman by sending him a timeshare owner's documents. Sussman would then send letters on behalf of that owner to Wyndham seeking to get the owner out of his or her obligations. Wyndham claims that TET's sales presentations routinely advised Wyndham's customers to cease making their timeshare payments. Wyndham also claims that TET and Sussman induced timeshare owners to stop making payments to Wyndham in breach of their timeshare contracts. Wyndham seeks to recover those missed payments as damages.

Wyndham initially filed this lawsuit on December 19, 2018. On June 24, 2021, Wyndham and the TET Defendants filed a joint motion and stipulation for entry of final permanent injunction (Doc. 275). The motion advised that the parties

---

[1] Those obligations primarily consist of paying maintenance fees and property taxes to the owners' associations and, for those owners with outstanding mortgages, mortgage payments to the developers.

reached a settlement as to all of Wyndham's claims against the TET Defendants. The Court granted the motion, entered the injunction, and dismissed Wyndham's claims against the TET Defendants (Docs. 277, 278, & 279).

Wyndham's remaining claims against Sussman are for contributory false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) (Count II); tortious interference with existing contracts under Florida law (Count IV); civil conspiracy to commit tortious interference (Count VI); and violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 – 501.213 (Count V). Sussman now moves for summary judgment on all counts. Wyndham moves for partial summary judgment on certain elements of its false advertising and tortious interference claims.

## II.   Legal Standard

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most

favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458–59 (11th Cir. 1994).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. Id. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

### III.   Analysis

#### A. Lanham Act False Advertising (Count II)

Section 43(a) of the Lanham Act provides, in pertinent part, that

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name,

> symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —
>
> …
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

To prevail on a false advertising claim under the Lanham Act, a plaintiff must establish: (1) the defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) it has been, or likely will be, injured as a result of the false or misleading statement. *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta v. Fla. Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 702 F.3d 1279, 1294 (11th Cir. 2012) (citing *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

Wyndham's false advertising claim is based solely on TET's oral sales presentations (OSPs). Wyndham claims that these OSPs were misleading and harmed Wyndham because they "directed timeshare owners to stop payments or

strongly suggested they do so." Doc. 313 at 6. Sussman contends that he is entitled to summary judgment on this count because Wyndham has produced "no direct evidence of the content of any specific OSP." Doc. 287 at 10.

It is true that "[o]ral statements, if 'widely disseminated,' are 'commercial advertising' under the Lanham Act." *ADT LLC v. Vision Sec., LLC*, No. 13-81197-CV, 2014 WL 3764152, at *4 (S.D. Fla. July 30, 2014) (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002)). A plaintiff bringing a false advertising claim must ordinarily show "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).

The question here is whether Wyndham has supplied any evidence that TET routinely told Wyndham's timeshare owners to stop making timeshare payments in the OSPs.[2] Wyndham instead argues that it can establish the content of the OSPs through the testimony of Wyndham's owners and TET's officers.[3]

---

[2] Wyndham submitted TET's script for the OSPs but does cite to it in support of its false advertising claim. None of the language in the sales script contains an instruction to cease making timeshare payments. *See* Doc. 313-15.

[3] Wyndham also argues that Jeffrey A. Stec's survey supports its false advertising claim, but the Court has ruled that his testimony is inadmissible. *See* Doc. 335.

The Court begins with the owner testimony. Wyndham cites to the depositions of four Owners: Landa Gabo, Monica Reyna, Christina Esslinger, and Mariko Hein. Wyndham claims that these owners testified that they were told to stop making their timeshare payments during an OSP. Esslinger did say that she was told to stop making timeshare payments during a sales presentation. Doc. 313-11 at 23:9–24:9. However, Wyndham blatantly misrepresents the testimony of the other three owners. Reyna only discussed written email communications, not any oral presentation. Doc. 313-10 at 29:12–34:24. Gabo stated that TET told her to stop making payments (Doc. 313-9 at 35:11–18), but she specifically testified that she could not remember *anything* that was said to her during an OSP (*id.* at 19:8–14). And while Hein stated that a TET representative told her to stop making payments at some point, she did not specify that this was during an OSP. Doc. 313-12 at 26:6–21. These depositions do not support a finding that TET, through the OSPs, "widely disseminated" instructions to stop making payments.[4]

With respect to the testimony from the TET officers, those depositions do not discuss the OSPs. While the officers testified that "consumer advocates" told

---

[4] Additionally, Esslinger—the only owner who discussed the content of a sales presentation—was not one of Sussman's clients and Wyndham does not list Esslinger as a relevant owner in support of its claims against Sussman. *See* Doc. 290-1 ¶¶ 13–15 and submitted sealed exhibit list identifying 250 Wyndham owners who were referred to Sussman. Wyndham, therefore, has no evidence that a single owner who was referred to Sussman was told to stop making payments during an OSP.

clients not to make payments, nothing they said suggests that these instructions were disseminated during a sales presentation. *See* Doc. 313-4 at 120:4–18; Doc. 313-5 at 97:7–23; Doc. 313-14 at 48:9–49:9.

Wyndham must show that the OSPs directly caused its owners to stop making payments and Wyndham cannot do this if it cannot prove that the OSPs contained the alleged false statements. Therefore, Sussman is entitled to summary judgment on Wyndham's Lanham Act Claim and Wyndham's Motion for Partial Summary Judgment here will be denied.[5]

## B. Tortious Interference (Count IV)

Under Florida law, the elements of a claim for tortious interference with an existing business relationship are "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1279 (11th Cir. 2015) (quotations and brackets omitted) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994)). Sussman argues that he is entitled to summary judgment on several

---

[5] Wyndham only asked for summary judgment as to certain elements of its false advertising claim. The Court need not address those arguments because Wyndham has failed to create an issue of fact as to whether the OSPs contained any false statements.

grounds, but the Court need only address one: whether Sussman interfered with Wyndham's contracts.

Sussman states that he never directed a "TET-referred timeshare client" to stop paying. Doc. 287-1 ¶ 26. Instead, when TET referred owners to him, he would "accept only those [owners] who have already decided to stop paying or who intend to stop paying, and have advised TET of this practice in writing." *Id.* Wyndham acknowledges that "[Sussman] never had any communication with the Sussman Owners." Doc. 313 at 16 (citing Doc. 313-3 at 43:5-8, 20-22; 44:6-9). In every owner deposition that Wyndham submitted, the owner states they stopped paying because of TET, not Sussman. Doc. 313-9 at 35:11–18; Doc. 313-10 at 36:7–16; Doc. 313-11 at 53:21–54:1; Doc. 313-12 at 26:2–12; Doc. 290-21 at 48:13–17. In fact, when asked about Sussman, the owners stated that they had no recollection of speaking with him or who he even was. Doc. 313-9 at 34:17–24; Doc. 313-10 at 36:18–20; Doc. 313-11 at 25:22–26:6; Doc. 313-12 at 31:2–4; Doc. 290-21 at 42:9–24.

Wyndham's evidence only supports a finding that TET, not Sussman, directed Wyndham's owners to stop making payments. Therefore, Sussman is entitled to summary judgment on Wyndham's tortious interference claim. Wyndham's motion for partial summary judgment on its tortious interference claim will be denied.[6]

---

[6] Like with its Lanham Act arguments, Wyndham asks for summary judgment on certain

### C. Conspiracy to Commit Tortious Interference (Count VI)

To prevail on a claim for conspiracy, a plaintiff must prove: (1) an agreement between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in furtherance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy. *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008). Sussman argues that he is entitled to summary judgment on three grounds which the Court will discuss in turn.

*1. Agreement*

Sussman first argues that there is no evidence of an agreement to tortiously interfere here because his contract with TET contains no provision requiring such conduct. True enough, there is no express written agreement between Sussman and TET for TET to get owners to stop making payments. But the Court must consider the circumstances surrounding Sussman's relationship with TET.

---

elements of its tortious interference claims. But because Wyndham failed to create an issue of fact as to causation, the Court need not address those arguments. Wyndham also claims that undisputed evidence shows that Sussman induced three Wyndham owners to breach their contracts. But Wyndham's evidence only shows that TET instructed those three owners to stop paying, not Sussman. Wyndham contends that these instructions were given "in direct reliance on guidance it received from Mitchell Sussman." Doc. 290 at 27–28. But whether Sussman instructed TET to direct timeshare owners to cease making payments is pertinent to Wyndham's civil conspiracy claim, not its direct tortious interference claim.

- 10 -

TET advertised that it would help clients exit their timeshare contracts so they would no longer be obligated to make payments. Sussman entered a retainer agreement with TET, whereby TET would pay him a fee to take certain actions on the behalf of each client they referred to him. Doc. 313-3 at 26:10–17; 38:14–39:25; 46:9–47:7. Sussman told TET that he would not accept any owner who had not stopped or did not intend to stop making payments to his or her timeshare company. *Id.* at 34:8–35:22; Doc. 287-1 ¶ 26. Sussman explained that this was because he could not successfully negotiate a release for any owner who continued to make payments on their timeshare—i.e., carry out the service he was being paid to do. Doc. 313-3 at 32:13–33:3. Several owners have testified that they stopped paying Wyndham because of TET's actions. Doc. 313-9 at 35:11–18; Doc. 313-10 at 36:7–16; Doc. 290-21 at 48:13–17. Based on these facts, a jury could reasonably find that TET and Sussman came to the agreement that TET would interfere with Wyndham's contracts. *See Orange Lake Country Club v. Reid Hein & Assocs., LLC*, 367 F. Supp. 3d 1360, 1368–69 (M.D. Fla. 2019).

    2. *Tortious Interference by TET (Causation)*

Next, Sussman argues that Wyndham's conspiracy claim must fail because it cannot prove that TET caused Wyndham's damages with respect to each of the 250 owners[7] at issue in this case (hereinafter the "relevant owners" or "Sussman

---

[7] This number seems to vary throughout the briefing. The parties have referred to 270

- 11 -

owners"). In support of its case for causation, Wyndham offers the following evidence: (1) direct testimony from Wyndham owners regarding three timeshare contracts; (2) testimony from TET's officers and communications by TET's staff indicating that TET's employees routinely instructed owners to stop making payments on their timeshares; and (3) the fact that a subset of the relevant owners missed their first payment after they hired TET.[8]

The Court begins with the owner testimony discussing three relevant contracts: those signed by (1) Richard Shobe; (2) Albertus and Yolanda Gabo; and (3) Monica Reyna and John F. Lerna.[9] Shobe, Yolanda Gabo, and Reyna testified about their interactions with TET and their decision to stop paying Wyndham. Doc. 313-9 at 35:11–18; Doc. 313-10 at 36:7–16; Doc. 290-21 at 48:13–17. They each stated that they stopped paying because of TET. This testimony and the circumstances surrounding their non-payment create an issue of fact as to whether

---

relevant owners in some instances (*see* Doc. 287 at 3; Doc. 313 at 24) and 250 relevant owners elsewhere (*See* Doc. 290 at 5). The Court will rely on the 250-owner figure here, based on Wyndham's employee affidavit that it submitted in support of its Motion. Doc. 290-1 ¶¶ 13–16.

[8] Wyndham also cites to Jeffrey A. Stec's survey, but the Court has ruled that his testimony is inadmissible. Doc. 335.

[9] In support of its tortious interference causation arguments, Wyndham also cites to the depositions of Christina Esslinger and Mariko Hein. But neither of these witnesses were listed by Wyndham as relevant owners in its claims against Sussman. *See* Doc. 290-1 ¶¶ 13–15 and submitted sealed exhibit list identifying 250 Wyndham owners who were referred to Sussman.

TET caused those owners to breach. Sussman's motion will therefore be denied with respect to those three contracts.

The remaining question is whether Wyndham has proven causation with respect to the other 247 relevant owners. All Wyndham has presented for those owners is: (1) some testimony from TET's officers regarding TET's general practices in communicating with clients; and (2) the fact that 208 of the 250 relevant owners stopped making their timeshare payments after hiring TET.

Wyndham's circumstantial evidence may permit a juror to infer that TET interfered with some contracts, but no juror could reasonably infer from this evidence that TET proximately caused Wyndham's damages.[10] Wyndham wants to proceed to trial on 247 individual contracts involving at least 247 individual owners. How can a juror reasonably determine person-by-person, contract-by-contract, which missed payments are attributable to TET's conduct? Without some form of direct testimony from these owners or expert testimony to fill in the gaps between TET's general practices and the decisions of the individual owners,[11]

---

[10] Wyndham makes much of this Court's discussion from its summary judgment order in *Westgate Resorts, Ltd. v. Reed Hein & Associates, LLC*, 6:18-cv-1088, 2020 WL 674108 (M.D. Fla. Feb. 11, 2020). Contrary to Wyndham's representations, that order simply acknowledged that a case cited by defendant did not announce a rule that circumstantial evidence is per se insufficient in tortious interference claims. *Id.* at *3. At summary judgment in that case, the Daubert deadline had not passed, and the door was still open for plaintiff to submit statistical expert testimony in support of its causation case. The order contained no "ruling," as Wyndham suggests, that circumstantial evidence is generally sufficient to support a tortious interference claim.

[11] This Court has previously entertained the possibility that expert statistical evidence

Wyndham cannot prove causation.[12] Wyndham has submitted no admissible expert testimony and Wyndham has not presented testimony from any relevant owner other than the three discussed above. Thus, Sussman is entitled to summary judgment on the civil conspiracy claim with respect to any owner whose testimony Wyndham cannot present at trial.[13]

### 3. Intracorporate Conspiracy Doctrine

Sussman last contends that he is entitled to summary judgment on this count because he acted as TET's agent and, pursuant to the intra-corporate conspiracy doctrine, he could not conspire with TET. The intra-corporate conspiracy doctrine sets out that "neither an agent nor an employee can conspire with his or her corporate principal or employer." *Lipsig v. Ramlawi*, 760 So.2d 170,

---

could aid a timeshare company in extrapolating the conduct of a subset of owners to the total population. *See Westgate Resorts Ltd. v. Reed Hein & Associates, LLC*, 6:18-cv-1088, 2020 WL 674108, at *3 (M.D. Fla. Feb. 11, 2020). However, the use of experts in these timeshare cases has, to date, proven unsuccessful due to reliability issues. *See* Doc. 335 at 3–6 (discussing failed attempts to prove causation via expert testimony). Without *any* reliable expert testimony here, the Court fails to see how Wyndham can demonstrate causation without direct testimony.

[12] Indeed, in an affidavit signed by Brandon Reed, CEO of TET, Reed states that, while some company representatives advised clients to stop making payments, TET did not have a companywide policy of doing so. Doc. 313-22 ¶¶ 4–5. Reed also states that its clients had varying reasons for not wanting to pay; some had already planned to stop making payments and others could not afford to pay anymore. *Id.* ¶ 6. Without the owners' testimony, a juror cannot determine which owners would have stopped paying independent of TET's involvement.

[13] In *Westgate Resorts, Ltd. v. Sussman*—another timeshare tortious interference case from this district—the court rejected a timeshare company's effort to prove its tortious interference damages with nearly identical evidence. 6:17-cv-1467, 2019 WL 3848805, at *2 (M.D. Fla. July 26, 2019). It stated that "[i]n no circumstances will the Court allow a case to proceed to a jury trial when it hangs on such loose evidentiary threads that Plaintiffs submit here." *Id.*

180 (Fla. 3d DCA 2000). Sussman argues that he was TET's agent for the purpose of securing contractual releases for TET's clients. But Sussman declined to address the conduct at issue in Wyndham's tortious interference claim—TET's directions to Wyndham owners that they stop making their timeshare payments. To the extent that Sussman can establish any agency relationship between him and TET, he has failed to demonstrate how this relationship encompasses TET's actions. Thus, the Court rejects this argument.

### D. FDUTPA (Count V)

FDUTPA makes unlawful all "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.'' Fla. Stat. § 501.204(1). FDUTPA is intended, inter alia, to "protect the consuming public and legitimate business enterprises from" such practices. § 501.202(2). To recover damages on an FDUTPA claim, a plaintiff must establish "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013).

*1. Trade or Commerce*

Sussman first argues that he is entitled to summary judgment because sending demand letters on behalf of timeshare owners is not "trade or commerce" within the scope of FDUTPA. Sussman relies on *Kelly v. Palmer, Reifler, &*

*Associates, P.A.*, 681 F. Supp. 2d 1356 (S.D. Fla. 2010), where the court held that a law firm defendant's pursuit of civil theft remedies by way of demand letters was not "trade or commerce." *Id.* at 1375. This is because actions taken in pursuit of civil legal remedies are not a typical commercial transaction envisioned by FDUTPA.[14] *See id.* at 1376. But the court also held that "attorneys are not automatically exempt from the operation of [FDUTPA]." *Id.* at 1371.

Sussman's conduct is distinct from that of the defendant in *Kelly*. Sussman's retainer agreement with TET states that he would not file a lawsuit in connection with his services and that TET would need to execute a separate agreement if it wanted him to do so. Doc. 313-1. Sussman was simply paid a fixed fee to draft and mail letters for TET clients and his contractual obligations did not involve the pursuit of any civil legal remedy. Sussman's conduct falls within FDUTPA's definition of trade or commerce.

### 2. *Conduct outside the State of Florida*

Sussman also argues that he is entitled to summary judgment on Wyndham's FDUTPA claim to the extent that it is based on TET's "sales scripts" and "sales pitches" because the scripts were not created in Florida. But as Wyndham points out, TET solicited clients from around the country, including

---

[14] *Kelly* did not rely on Florida case law, but rather, case law interpreting consumer protection laws from other states. *See Kelly*, 681 F. Supp. 2d at 1376.

several relevant owners in Florida, and Sussman sent his demand letters to Wyndham in Florida. Sussman declined to address these facts and has failed establish that the conduct pertinent to the FDUTPA claim occurred entirely outside of the state of Florida.

### 3. *Causation*

Last, Sussman contends, as he does with the tortious interference claim, that Wyndham has failed to prove causation of damages. For the reasons the Court discussed with respect to Wyndham's civil conspiracy claim, *see infra* III.C.1, Sussman is entitled to summary judgment on Wyndham's claim for damages under FDUTPA with respect to any owner who does not testify.[15]

### E. The Owner Releases

Sussman last argues that he is entitled to summary judgment on all counts as to any of the owners with whom Wyndham signed contractual releases. Sussman's Motion provides no legal authority supporting his argument. In his Reply, Sussman claims that Wyndham rescinded every contract with a release. He further argues that because a rescinded contract does not legally exist, Wyndham cannot claim damages for missed payments on those contracts. But Sussman offers no evidence supporting a finding that Wyndham rescinded any contract here.

---

[15] Sussman's Motion is denied to the extent it requests summary judgment on Wyndham's claim for injunctive relief under FDUTPA.

Wyndham simply reached settlements with its owners for their missed payments. While these settlements may impact Sussman's damages in this case, it does not have any bearing on the question of liability.[16]

## IV. Conclusion

Accordingly, it is hereby **ORDERED** that:

1. Defendant's Motion for Summary Judgment (Doc. 287) is **GRANTED** in part as to Counts II, IV, V, and VI of the Amended Complaint as detailed in this order. In all other respects, Defendant's Motion is **DENIED**.

2. Plaintiffs' Motion for Partial Summary Judgment (Doc. 290) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 27, 2021.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[16] Sussman cites to several cases in his reply, but they are all inapposite. In *Mariscotti*, a tortious interference claim was defeated by the finding that there was no breach of contract, only a valid cancellation. *Mariscotti v. Merco Grp. at Akoya, Inc.*, 917 So. 2d 890, 892 (Fla. 3d DCA 2005). In *Sullivan*, the tortious interference plaintiff failed because no contract was formed in the first place. *Sullivan v. Econ. Rsch. Props.*, 455 So. 2d 630, 631 (Fla. 5th DCA 1984). And in *DFG Group, LLC*, the court simply determined that attorneys' fees were not warranted because a contract was affirmed. *DFG Grp., LLC v. Heritage Manor of Mem'l Park, Inc.*, 237 So. 3d 419, 422 (Fla. 4th DCA 2018).