# UNITED STATES DISTRICT COURT OF THE MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

WYNDHAM VACATION OWNERSHIP, INC., etc., et al.,

Plaintiffs,

v.

Case No.: 6:18-CV-02171-Orl-31DCI

REED HEIN & ASSOCIATES, LLC, etc., et al.,

Defendants.

______________________________________/

**REBUTTAL REPORT OF JOEL MARK**

1. I am an attorney at law, licensed to practice before all of the Courts of the State of California. I also am admitted to practice before all of the Federal District Courts within California, the Ninth Circuit Court of Appeals, the Federal Circuit Court of Appeals and the United States Supreme Court. And, I am admitted by the Supreme Court of the State of Colorado, but that admission currently is inactive.

2. I give this Report as of March 15, 2021, based upon my own personal knowledge and independent professional judgment and discretion, as discussed in greater detail below. Except as may be noted below, I have prepared this Report personally, to express my own personal opinions regarding the issues that have been raised with me by retaining counsel. These opinions have been reached after independent review and research, and they are not based upon any specific instruction from anyone else.

Exhibit 5

## Engagement

3. I was retained effective February 15, 2021 by Reed Hein & Associates, LLC (Reed Hein) as an expert witness in connection with certain matters having to do with the ethical questions relative to attorneys, in connection with the action *Wyndham Vacation Ownership, Inc. v. Reed Hein & Associates, LLC, et al*, United States District Court for the Middle District of Florida, Orlando Division, Case No. 6:18-cv-02171-Orl-31DCI (the Matter), wherein Plaintiff Wyndham is asserting, among other things, that Reed Hein has engaged in the unauthorized practice of law (UPL) in Florida. Specifically, I have been retained to examine and testify concerning the ethical propriety of Reed Hein's actions specified and discussed in greater detail below, and in the materials referred to in this Report, including providing a rebuttal to the opinions provided in the Report of Timothy P. Chinaris (Mr. Chinaris), filed in this matter, as executed on February 1, 2021, as well as additional matters that were raised by or as a result of Mr. Chinaris' testimony in his deposition taken in this matter on March 4, 2021.

## Qualifications

4. My qualifications to provide such expert testimony are set forth and otherwise reflected in my current resume and in a partial list of my speaking engagements and professional articles given or written since 1992, both of which are appended hereto as Exhibits A and B respectively.

5. Since 1995, I have served as a consultant or expert witness regarding attorney ethics, attorneys' fees and attorney malpractice matters in over 110 previous engagements. In the past five years, I have testified as an expert at trial (or arbitration), by deposition or by declaration in the matters listed in Exhibit C appended hereto.

6. In addition to the qualifications reflected in Exhibits A and B appended hereto, from 2009 through 2012, I was the Presiding Arbitrator of the California State Bar Mandatory Fee

Arbitration Program, first appointed by the State Bar Board of Governors (now Board of Trustees) commencing January 1, 2009. In addition to that appointment, I was appointed as a member of and served on the State Bar Committee on Mandatory Fee Arbitration (CMFA) in 1993 through 1997, in 2002 through 2008, and again in 2013 through 2019. I chaired the CMFA for two separate terms, in 1997 and in 2008. Between my first two terms on the CMFA, I also served on the California State Bar Committee on Professional Responsibility and Conduct (COPRAC), which is the State Bar's standing ethics committee, from 2000 through 2002, and I was recently appointed to another four-year term on COPRAC from October 2020 through October 2024. Also, since 2010, I have been serving as a Special Deputy State Bar Trial Counsel for disciplinary matters where the California State Bar Office of Trial Counsel has potential conflicts that require referral to outside prosecutors, in which capacity I have investigated and prosecuted over 20 disciplinary complaints brought against California attorneys.

7. I first became involved with the California mandatory fee arbitration process in the early 1980s. I have served on the panels of mandatory fee arbitrators for the Los Angeles County, Santa Monica, San Fernando Valley, Desert Bar and Ventura County local MFA programs, in addition to the panel of arbitrators of the State Bar MFA program. I chaired the Los Angeles County program for three years, and I served as a member of the executive committee of the Ventura County program from 2001 through 2016, where I participated in a complete re-write the program rules. In my final year as State Bar Presiding Arbitrator in 2012, I also participated in the extensive revision of the State Bar Rules for mandatory fee arbitrations, which were approved as written by the State Bar Board of Trustees effective on July 1, 2013.

8. I personally have participated as a fee arbitrator in well over approximately 350 mandatory fee arbitrations (my count as of approximately 2010, when I ceased keeping count of such arbitrations). In most I served as a sole arbitrator or panel chair. In the remainder, I served as a panel member. The vast majority of such arbitrations involve, in addition to attorneys' fees issues, alleged ethical violations of and alleged malpractice claims against the participating attorneys. In addition, I have been selected over a dozen times as an arbitrator for the AAA in

matters involving attorney-client fee disputes or other matters involving attorneys' fees or attorney ethics. Moreover, for the first approximately 15 years of my practice, a significant area of my litigation practice was attorney malpractice defense, many of which matters involved attorneys' fees and related ethics issues and included a number of actions involving questions relating to malicious prosecution and abuse of process claims.

9. Throughout my career as a business litigator, although not as an expert witness to date, I also have had involvement in numerous cases involving Lanham Act and related claims.

10. While a member of the CMFA, I was the lead editor for the revision of the State Bar approved form fee agreements in 1997, and I participated in significant revision of those forms in 2004 and in 2005 and in additional less-extensive revisions and additions to the form fee agreements periodically thereafter throughout my service on the CMFA. I also re-wrote the current lesson plan for the State Bar's fee arbitrator training program. I personally have moderated or participated in over thirty-five arbitrator training sessions throughout the State, where I have helped to train over approximately 5000 local and State Bar fee arbitrators.

11. Additionally, the CMFA publishes periodic Arbitration Advisories regarding unique attorneys' fees issues that may provide additional guidance to fee arbitrators handling attorney-client fee dispute arbitrations. Over my years on the CMFA, I authored all or substantial portions of at least a dozen or more of these advisories, or approximately over 30% of them. I have been a contributor to many other Advisories. They are available on the California State Bar website at www.calbar.ca.gov under the Committee on Mandatory Fee Arbitration page.

12. Since 1995, among my 110 consulting or expert witness engagements, I have been retained as an independent expert by the Los Angeles County Superior Court and also by the State Bar of California, and out-of-state matters pending or arising out of litigation in New Jersey, Florida, Utah and Geneva, Switzerland. I have given testimony under oath, either by deposition or Report, in over 30 of those matters, and I have testified at trial or arbitration in over a dozen of those matters. I have never been found to be not qualified to give an opinion involving any matter having to do with attorneys' fees issues.

## Compensation For This Engagement

13. In connection with my work on this assignment, Reed Hein has agreed that it will compensate me at the hourly rate of $600. My rate is the same for all time on this assignment, including general investigation, data and document review, research, Report preparation, and possible testimony. My compensation is dependent upon the time I expend and not upon the nature of any opinions I may form or express. My work as of the date of this Rebuttal Report is set forth in my billing statements on this matter, attached collectively hereto as Exhibit D.

## Materials Reviewed and Facts Considered

14. In connection with forming the opinions expressed below, I have reviewed the following materials, facts and data:

- Report of Timothy P. Chinaris
- Amended Complaint for Damages and Injunctive Relief
- Amended Answer and Affirmative Defenses of Reed Hein
- Sussman Response to First Request for Admissions (RFA)
- Plaintiffs' Response to Defendant [Sussman's] Third RFA
- Deposition of Mitchell R. Sussman, Esq.
- Deposition of Timothy P. Chinaris
- Other exhibits and authorities identified below

## Opinions and Conclusions

15. *Improper Forum*: The first opinion I reached, although not in response to any specific opinion raised by Mr. Chinaris, is that Wyndham lacks standing, at least in this forum, to complain about whether or not Reed Hein may have engaged, or currently is engaging, in UPL.

16. Because the primary objective of attorney regulation is client protection, Florida law has given the Supreme Court of Florida exclusive jurisdiction to regulate the admission of persons to the practice of law and the discipline of persons admitted, Art. V, § 15, Fla. Const.

Accordingly, that court has inherent – and exclusive – jurisdiction to prohibit the unlicensed practice of law. R. Regulating Fla. Bar 10-1.1. As a result, "[n]o private right of action exists for individuals to pursue an unauthorized-practice-of-law claim in the first instance[.]" *Gonczi v. Countrywide Home Loans, Inc.*, 271 F. App'x 928, 930 (11th Cir. 2008) (citation omitted). In addition, "the Florida Supreme Court has delegated its authority over the investigation and prohibition of the unlicensed practice to the Florida Bar." *Id.* at 929–30, cited in *Kozyrev v. Ponomarenko*, No. 19-CV-60497, 2020 WL 4818904, at *9 (S.D. Fla. Aug. 18, 2020), reconsideration denied, No. 19-CV-60497, 2020 WL 6135050 (S.D. Fla. Oct. 19, 2020). Mr. Chinaris in fact agrees with this exclusive jurisdiction of the Florida Supreme Court as delegated to the Florida Bar (Chinaris Deposition, p. 35, ll. 14-20[1]).

17. Similarly, the power to discipline attorneys in California is an "expressly reserved, primary, and inherent power" of the California Supreme Court. *Obrien v. Jones* (2000) 23 Cal.4th 40, 48; *Saleeby v. State Bar* (1985) 39 Cal.3d 547, 557; Bus. & Prof. Code, § 6100. Although the State Bar Act originally allowed any court to administer attorney discipline, "in 1951, the State Bar Act was amended to exclude superior courts and appellate courts from exercising such jurisdiction, leaving the Supreme Court as the sole judicial entity with jurisdiction over attorney discipline. Bus. & Prof. Code, §§ 6087, 6100; *Jacobs v. State Bar* (1977) 20 Cal.3d 191, 196. Thus, in California, the inherent judicial power of the superior court does not extend to attorney disciplinary actions. That power is exclusively held by the Supreme Court and the State Bar, acting as its administrative arm. [Citation.]" *Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697, 1710. In 1988, that power and exclusive jurisdiction was transferred to the then newly-created California State Bar Court, subject to final review by the Supreme Court (with the sole exception of criminal proceedings pursuant to and ancillary remedies available in an action under Bus. & Prof. Code §§ 6126-6126.5).

[1] Further references to Mr. Chinaris' deposition will hereinafter be by page and line designation, such as "Chinaris, p. 35, ll. 14-20."

18. As the *Sperry* case cited by Mr. Chinaris in his Report instructs, the purpose of Florida's regulation of attorney admission specifically, as well as matters of compliance with the applicable rules of professional conduct, is "to protect the public from being *advised and represented* in legal matters by unqualified persons over whom the judicial department can exercise little, if any, control in the matter of fractions of the code of conduct which, in the public interest, lawyers are bound to observe [emphasis supplied]." Here, it is Wyndham's operative allegation that its problem with Reed Hein, as well as with the attorney defendants in this case, is not that Reed Hein is guilty of advising or representing Wyndham, but that Reed Hein is doing the exact opposite – assisting alleged victims of Wyndham's alleged fraudulent and other improper conduct regarding potential remedies that are adverse to Wyndham's interests. Mr. Chinaris also agrees that neither Reed Hein nor Mr. Susman has ever advised or represented Wyndham as an attorney or otherwise (Chinaris, p. 36, l. 20-p. 37, l. 4).

19. Accordingly, whether and to what extent Reed Hein may be held liable for UPL based upon its own activities within Florida is not properly before the Court in this case.

20. Alternatively, if Mr. Chinaris' intent is to claim that Reed Hein's liability for UPL is derivative, based upon the conduct of Mr. Sussman and perhaps some of the other attorney defendants, the result would not change.[2]

21. In this regard, it is noteworthy that Mr. Sussman has had dealings with the Florida Bar disciplinary system, and in other jurisdictions, about his work as an attorney representing people who want to exit a timeshare relationship. I am informed that, on November 17, 2016, following a protracted course of correspondence regarding the same activities about which Mr. Chinaris opines, Florida Bar authorities closed its discipline file against Mr. Sussman with no discipline whatsoever and with only a caution that, should any of his clients residing in Florida need a deed on a Florida timeshare interest prepared, Mr. Susman must hire a local Florida lawyer

[2] It is difficult to understand upon just what circumstances Mr. Chinaris bases his UPL opinions. He jumps back and forth between a conclusion that Reed Hein allegedly is providing legal services, while admitting in other places that Reed Hein is only doing this "through Mr. Sussman . . . ." (*e.g.*, Chinaris, p. 65, ll. 5-14). However, as noted, either way, Reed Hein is not guilty of UPL.

for that purpose. I further am informed that, on the occasions since the date of the letter where a deed was required for any client resident in Florida, the work would be done either by an employee of Mr. Sussman's law firm admitted in Florida or by hiring an independent Florida lawyer. Also, I am informed that, in the past, Mr. Sussman has concluded successfully over 1300 matters involving Wyndham timeshare holders, apparently half being Reed Hein customers, without any complaints by any such customers to the Florida regulatory authorities regarding his legal services.

22. Thus, with regard to any claim by Wyndham against Reed Hein regarding its alleged improper UPL based upon Reed Hein's alleged performance of "legal services" in Florida that is derivatively based upon Mr. Sussman's conduct, it must be expected no such action Reed Hein would result in any discipline as well.

23. Accordingly, in all events, Wyndham's complaints against Reed Hein – whether based upon Reed Hein's conduct or are derivatively based upon Mr. Sussman's conduct or the conduct of another attorney defendant here – simply are raised in the wrong forum.

24. *Lack of a Viable Cause of Action*: Generally, except in very limited circumstances not present here, a person acting in the capacity of an attorney owes no duty of care to a non-client third party, and almost never to an adversary in a contested matter – especially such as a litigation matter. Rather, "[u]nder present California law, an attorney may owe a duty to a third person, and may be liable if the third person who was intended to be benefited by his performance is injured by his negligent execution of that duty." *Roberts v. Ball, Hunt, Hart, Brown Baerwitz*, (1976) 57 Cal.App.3d 104, 110; *see also*, *Gonczi v. Countrywide Home Loans, Inc., supra*; "California Practice Guide, Professional Responsibility," The Rutter Group, pp. 6-48, et. seq., and cases cited therein. Mr. Chinaris agrees with this conclusion (Chinaris, p. 35, ll. 21-24). As Mr. Chinaris explained, neither Reed Hein nor Mr. Sussman owed any fiduciary or other duty to Wyndham (Chinaris, p. 39, ll. 4-20).

25. Moreover, according to Mr. Chinaris, Wyndham's claim against Reed Hein is based upon alleged violations of rules of professional conduct applicable to attorneys. However, such alleged violations alone will not support a viable cause of action against any attorney. "Violation

of the State Bar Rules of Professional Conduct prohibiting concurrent representation of conflicting interests without each client's informed written consent . . . does not, standing alone, prove the malpractice or the fiduciary breach." *Yanez v. Plummer*, (2013) 221 Cal.App.4th 180, 188. As noted above, the same is true in Florida.

26. Accordingly, even if Reed Hein's actions as an alleged unlicensed lawyer were to have been adverse to Wyndham's interests, Wyndham would have no standing to bring any cause of action against Reed Hein, at least not in the context of this case.

27. *Reed Hein Disclaimer*: A further problem with Mr. Chinaris' conclusions as to Reed Hein regarding the assertion of the applicability of Florida or California rules regarding attorney conduct is that such claim is not supported by the facts.

28. First, on its website and elsewhere, Reed Hein expressly disclaims and explains that it provides no legal services to its customers. Specifically, Reed Hein states:

> Timeshare Exit Team by Reed Hein & Associates, is *not a law firm, and Timeshare Exit Team does not provide legal advice or representation.* There is no attorney-client relationship between [the customer] and Reed Hein. Timeshare Exit Team will assess your opportunities for an exit without the need for using an attorney, and should it be necessary to hire an attorney on your behalf, Timeshare Exit Team will help guide the strategy of the attorney on your behalf, as outlined in our contract with you and the Power of Attorney you provide to us in connection therewith. [Emphasis supplied.]

29. Also, the Reed Hein "Information" sheet – containing 11 disclosures each initialed by the customer – explains that, if an attorney is hired, Reed Hein's role simply will be to be a "liaison between [the customer] and the attorney." I am informed that this information, explaining that Reed Hein is not providing legal services but rather is acting only as a liaison between the customer and the attorney, also is articulated in Reed Hein sales presentations.

30. In addition to Reed Hein's advertising representations and other written materials that I have reviewed, customers regularly (since at least 2016) have executed a power of attorney (PoA) that expressly authorizes Reed Hein to "[h]ire and fire attorneys on [customer's] behalf to aid in the negotiation and legal work necessary to settle any claim related to [customer's] timeshare interest . . . ." Before executing the PoA, most recently in any event, the customer also is advised in writing to consult with "an attorney or other qualified person" for assistance in understanding the scope and consequences of the PoA.[3] And, as noted above, in the "Information" documentation that I have reviewed, it also is explained that Reed Hein's role regarding the legal activities performed by any such attorney will be only that Reed Hein will assign an "account coordinator" to each case who will act as "the liaison between [the customer] and the attorney" and through whom "any questions or concerns" about the attorney should be addressed.

31. Mr. Chinaris provides no explanation in his initial Report why the disclaimer and the other evidence referred to above is insufficient in any way or otherwise may not be a complete defense to any UPL claim against Reed Hein.[4] Rather, against this evidence, the primary basis for Mr. Chinaris' opinion that Reed Hein is engaged in UPL in Florida is Reed Hein's use of the word "legal" in Reed Hein's advertising. In this argument, Mr. Chinaris states that such use of the word "legal" by itself constitutes an admission that Reed Hein is holding itself out as practicing law (engaging in UPL) – in other words, according to Mr. Chinaris, the use of the word "legal" is an admission that Reed Hein is engaged in doing the "work of a lawyer."

32. Mr. Chinaris' conclusion in this regard, other than being directly contradicted by Reed Hein disclaimer, advertising and other evidence referred to above, is nothing more than an overstatement of the import of the use and context of the word "legal." For instance, in defending

---

[3] It is noteworthy that Mr. Chinaris did not offer any criticism of the PoAs used by Reed Hein. Indeed, he did not review any of them (Chinaris, p. 17, ll. 17-21).

[4] In his deposition, Wyndham's counsel attempted to have Mr. Chinaris agree to an analogy to the effect that "If Bernie Madoff had disclaimed that he was engaged in a Ponzi scheme, it would still be a Ponzi scheme." This analogy misses the point, however. The disclaimer and other information referred to above clearly advises the client that the client may not reasonably expect the disclaiming party to be acting as the would-be client's attorney. Such a disclaimer is sufficient to prevent the formation of any attorney-client relationship at all, and thus serves as adequate protection of the public against UPL. *See, e.g.*, COPRAC Formal Opinion No. 2003-161.

a multitude of cases filed by Wyndham timeshare holders alleging improprieties with respect to its own sales procedures and presentations, such as *Buxton v. Wyndham* United States District Court, Middle District of Florida, Orlando Division Case No. 6:19-cv-1555-Orl-31DCI, for instance, Wyndham also contends about its own activities (so far without successful conclusion) that its own sales procedures and presentations at issue in that case also state that Wyndham's timeshare operations are fully legal. Certainly, Wyndham is not intending to admit, in stating that its sales procedures and presentations may be "legal," that Wyndham also is practicing law without a license. Rather, Wydham merely is contending it is engaged in the business of timeshare sales and is doing so allegedly "in a legal way."

33. Similarly, Reed Hein's advertising that its procedures and methods are "legal" simply is not evidence that Reed Hein is practicing law. Reed Hein merely is stating that it is in the timeshare exit business and is providing assurances that its procedures and methods are conducted in a legal way. In this sense, the statement that Reed Hein's procedures and methods are "legal" is no more an admission that it is practicing law than if someone who crosses a street in a crosswalk and states that the crossing was "legal" – as opposed to perhaps being "jaywalking" for instance – is admitting to the practice of law. In fact, Mr. Chinaris conceded as much during his deposition (p. 88, ll. 5-25).

34. Further, Reed Hein's activities on behalf of its customers simply do not constitute the practice of law, unauthorized or otherwise. Merely negotiating a contract for the benefit of another is not the practice of law. Real estate agents do this universally, often in residential settings using written documents prepared by others, such as a trade association, almost always without the involvement of any attorney in the negotiations or documentation. Corporate executives do the same. Entertainment and sports agents – who often are far more familiar with the best (or at least the customary) terms and conditions within their industry to ask for than the lawyers they may hire to document the final arrangement – do the same, often then turning over the negotiated terms to clients' counsel for preparation or review of appropriate documentation.

35. As well, the Florida Bar decision in Mr. Sussman's case specifically did not take any action against him for his actions in Florida, including a history of sending demand letters to Wyndham and others, so long as if a formal document needed to be filed in Florida (in that case a deed), it would be prepared by a Florida-admitted attorney. Again, Mr. Chinaris does not disagree with the propriety of such an arrangement so long as any "legal decision" as opposed to economic terms are made by the lawyer (Chinaris, p. 44, l. 22-p. 45, l. 24; p. 68, l. 20-p. 69, l. 6); in fact, he concedes that even "a friend" can "call[] up" the time share company and ask it "to let [his friend] out of the contract and . . . that's probably not the practice of law."

36. These and many other examples all illustrate that, even in cases where Reed Hein may negotiate the terms of an exit agreement with a developer on behalf of one of its customers, that fact alone does not establish that it is practicing law, especially where, as here, it advertises that if an attorney's services are necessary to conclude the matter an outside attorney will be employed to prepare any legal documentation required to conclude the transaction.[5]

37. Also, the legal authorities cited by Mr. Chinaris regarding his UPL opinions include four Florida cases – all disciplinary cases inapposite authority in this case as to Reed Hein – do not apply to the expressed terms of the services being offered by Reed Hein at issue in this case. In *Stranke*, although discussed in a cursory way only, UPL was admitted because the attorney in question had failed to pay his bar dues. In *Deddish,* the alleged UPL was committed by a non-party and involved an express representation that the non-party had "lawyers on staff" when it had none. Also in *Deddish,* the lawyer in question, who had committed other far more serious offenses, such as tax evasion, stipulated to the UPL of the non-party; the non-party never had the opportunity to defend against that claim and the facts in *Deddish* as to the non-attorney are distinguishable from Reed Hein's alleged conduct here in any event. The two additional cases cited by Mr. Chinaris, *Matus* and *Florida First Financial*, also are disciplinary cases inapposite to this case,

---

[5] Mr. Chinaris in fact agrees that any agent or anyone else acting under a power or attorney may advise the principal about the economic terms of any contractual arrangement so long as "the decision is . . . that of the principal" (Chinaris, p. 46, ll. 13-21).

both (according to Mr. Chinaris) involved an express representation that the sanctioned party was in fact practicing law in Florida. No such representation appears anywhere in Reed Hein advertising or other documentation of which I am aware. Rather, Reed Hein disclaims any practice of law and adverts that any such activity will be referred to independent legal counsel.

38. Based upon my personal ten-year plus participation in the California disciplinary process as a California State Bar Special Deputy Trial Counsel for disciplinary matters, the conduct upon which Mr. Chinaris bases his opinion regarding Reed Hein's alleged UPL would not likely establish UPL under the "clear and convincing evidence" standard applicable to disciplinary proceedings, in California in any event.[6]

39. Moreover, to the extent that Mr. Chinaris' opinion as to Reed Hein's alleged UPL is based derivatively upon the conduct of Mr. Sussman, and perhaps the other attorney defendants, that is not an issue for Reed Hein to defend. Nevertheless, Mr. Sussman has provided assurances that he is not violating Florida law in providing the services he does for Reed Hein customers. I also am informed that Mr. Sussman has handled approximately 1,300 cases involving Wyndham timeshare holders, approximately half of them Reed Hein customers, successfully on behalf of his clients. Accordingly, Reed Hein would be justified in continuing to place its confidence in the probability that Mr. Sussman will be able to establish the bona fides of his work for Reed Hein customers, as Mr. Sussman already has done before the Florida Bar and other regulatory authorities in response to their previous inquiries mentioned above.

40. Lastly, Mr. Chinaris' reference to Florida Rule 4-5.5 addressing multijurisdictional practice of law within Florida must be read in the light of the official comments to the rule. The comments also explain that there is no single test to determine whether a lawyer's services are provided in a "temporary basis" in Florida "and may therefore be permissible . . . on a recurring basis or for an extended period of time. . . ." From my experience, the Florida comment in this

---

[6] Rules of Procedure for the State Bar of California, Rule 5.103, provides that, in any disciplinary action, "The State Bar must prove culpability by clear and convincing evidence."

regard is consistent with the general view taken now in most jurisdictions – that almost all multijurisdictional practice activities, including sending demand letters to Florida residents – are "temporary" when occurring in any state where significant multijurisdictional economic transactions regularly take place, so long as Florida-admitted lawyers ultimately are retained if the matter proceeds to the preparation of a formal deed or a lawsuit to be filed in Florida.

41. Accordingly, to the extent Wyndham contends here that Reed Hein is "practicing law" despite the clear evidence to the contrary, that is a matter for a possible complaint to Florida regulatory authorities. It is not a viable basis for a claim by Wyndham to present before this Court. And it is established neither by the facts of which I am aware nor the alleged facts and legal authorities upon which Mr. Chinaris bases his conclusions in this regard.

42. *Alleged Unethical Fee Sharing with a Non-Attorney*: In my view, the most noteworthy aspect of Mr. Chinaris' "fee sharing" allegation is what he does not state in his Report. So far as I am aware, based upon my 48 years practicing law and my extensive service as an expert witness involving legal ethics, there is no law, rule or regulation that prevents any American citizen from hiring someone – even someone who is not a lawyer – to find a lawyer for the citizen, supervise the lawyer as an agent for the citizen or pay the lawyer with money provided by the citizen. Mr. Chinaris does not contest this statement in his Report or in his deposition (Chinaris, p. 42, l. 22-p. 43, l. 2); and, indeed, I believe it is incontestable.

43. Mr. Chinaris did attempt to "clarify" his answer on this point at his deposition (Chinaris, p. 43, ll. 3-25). However, he conceded that it would be permissible if a potential client askes a friend: "Hey, Tom, do you know a lawyer that practices personal injury within five blocks of where I live and Tom looks it up in the internet equivalent of a phonebook and gives them an address, that's probably okay." Mr. Chinaris fails to explain why it is different if "Tom" is paid to find the lawyer in the phonebook, or if "Tom" knew from his Aunt Sarah of a good lawyer, or if "Tom" was a retired corporate executive formerly in charge of a Fortune 500 company's legal department who had supervised its hiring and firing of hundreds of lawyers from around the country. And, Mr. Chinaris fails to explain how it is or even should be more permissible for "Tom"

to help someone to find a lawyer if "Tom" has no experience finding lawyers other than in a phonebook than if "Tom" actually knows of appropriate attorneys who may be able to provide the same service from actual first-hand past experience.

44. Nor can it be expected that Mr. Chinaris' fictional "Tom" ever would be found to be guilty of UPL merely by helping someone find, pay and supervise a lawyer for another, at least in Florida in any event. As Mr. Chinaris himself testified under oath in another case before the Supreme Court of Florida, Case No. SC14-1730, among other things, "It is quite common for business, such as nursing homes, to outsource administrative responsibilities [including] compliance issues and monitoring litigation." He concluded there that doing so is not UPL because the "litigation liaison between its customers and, behalf of its customers, acts as a client would act in a lawyer-client relationship pursuant to the authority granted to it by its customers" including such activities as locating lawyers, providing litigation coordination services "which include recommendations regarding objectives of the representation," "monitoring the litigation," "recommending when cases should be settled" and "carrying out its customers' instructions, which may include making the types of decisions clients ordinarily make in the course of hiring and working with a lawyer, such as determining the fees to be paid and reviewing documents to ensure that facts are accurately stated and arguments are consistent with arguments in other cases." As Mr. Chinaris there also concluded, consistent with the outcome of Mr. Sussman's case in Florida, such liaison and coordinating activities cannot be UPL unless the liaison may "enter an appearance in court or sign pleadings in any jurisdiction where" the liaison was not licensed because, otherwise, "then every out-of-state lawyer who is consulted about trial strategy in a case pending in a court where that lawyer is not licensed would be guilty of [UPL]. But that is not the case."

45. In addition, the facts upon which Mr. Chinaris does base his fee sharing opinion also simply do not constitute unethical "fee-sharing" of any kind. Reed Hein charges its customers a set fee, whether or not an attorney is hired to perform some aspect of the Reed Hein-supervised exit strategy applicable to the specific customer's needs. If an attorney is hired, the attorney may reject the representation for any reason (as Mr. Chinaris agrees, p. 50, ll. 14-17). Once the

representation is accepted, a flat fee is paid to the attorney in some pre-agreed amount. Once the fee has been paid, it is not "split" or shared by the attorney with anyone (as Mr. Chinaris also agrees, p. 51, ll. 9-14). The fee is not based upon the outcome of any matter and, once paid, it is not refundable by the attorney to anyone. Such an arrangement simply is not unethical "fee sharing" as that practice may be prohibited by any applicable rules of professional conduct.

46. Moreover, the prohibitions of California Rule 1-310[7] are solely applicable to the attorney (the "member") in question, not to the party with whom the attorney may choose to "share" his or her fee. Here, the evidence I have seen, as noted above, is that all Reed Hein has done is to facilitate the hiring of each attorney, most regularly since at least 2016 pursuant to the PoA executed by its customers, and arranged to pay the attorney a pre-agreed fee for the required services. Finally, Mr. Chinaris agrees that nothing in the contractual or other documentation he has reviewed required any attorney to split any fee with Reed Hein or anyone else (Chinaris, p. 47, ll. 9-21).

47. Instead, Mr. Chinaris offers a hodge-podge of theories about alleged fee-splitting revealing more a "whatever sticks" form of advocacy than a reasoned legal opinion. When properly dissected, however, as any disciplinary prosecutor is required to do, none of its parts holds up.

48. First, on paper, at the outset of the Reed Hein relationship with its customer, no split of any fee is required. In the event the customer can be extricated from a Wyndham timeshare without lawyer assistance, Reed Hein keeps the entire fee (as Mr. Chinaris agrees, p. 49, l. 22-p. 50, l. 2)[8]. In such an eventuality, Mr. Chinaris' entire alleged fee-splitting argument becomes moot; nothing is shared by any lawyer with anyone else.

---

[7] Mr. Chinaris' references to the California Rules of Professional Conduct all are to the rules that were effective only until November 2018, at which time they were entirely superseded by new rules renumbered to be more consistent with the ABA Model Rules numbering system and to make other substantive changes as well. Since Mr. Chinaris is basing his opinions upon the superseded rules only, my Report will address these prior rules only. To the extent that Mr. Chinaris may at some point specify rules that he contends may be applicable to ongoing conduct, such as in connection with perhaps a claim for injunctive relief, I reserve the right to reply accordingly.

[8] Noteworthy in this regard, the more cooperative Wyndham might choose to be assisting its customers exiting their time share contracts the less any Reed Hein customer would ever need the services of any attorney.

49. Second, if an attorney's services do become required, then the question becomes whether any "fee" has been split and, if so, just what fee is being split. Per the contract, the customer agrees in advance that, if a lawyer's services are required, Reed Hein will pay the lawyer his or her fixed fee as a general expense out of its overall operating income and not out of any specifically segregated portion of the fee paid to Reed Hein by the customer in question. And, even if some portion of the customer's fee were used directly to pay for the attorney, even then it is the customer and Reed Hein who agree to split the fee not the attorney. Finally, in all events, it is the fee paid to Reed Hein that is being split, not the fee being paid to the attorney, as Mr. Chinaris also agreed (Chinaris, p. 49, ll. 3-8). Again, for this second reason, Mr. Chinaris' argument becomes moot because, in all events, the attorney (the "member") has not agreed to split any portion of his or her fee.

50. Third, Mr. Chinaris argues alternatively that it is Reed Hein that is providing the legal services directly (engaging in UPL). If true (which as noted above it is not), then how Reed Hein accomplishes the provision of any alleged "legal services" to its customers would be governed by rules applicable to how law firms compensate their attorney personnel generally. Those rules fully permit law firms to hire attorneys providing the services such as Mr. Sussman and others are providing on many bases including a "contract attorney" or "of counsel" arrangement. And, in California, financial arrangements with such contract attorneys or of counsel are not fee-splitting and do not need to be disclosed to the would-be client. *See, e.g., Shaffer v. Superior Court* (1995) 33 Cal. App. 4th 993; *Margolin v. Regional Planning Comm. of Los Angeles* (1982) 134 Cal. App. 3d 999.

51. Fourth, Mr. Chinaris lastly argues, again apparently in the alternative, that the money used to pay for the attorney's services, rather than coming from the customer, comes from Reed Hein acting as a non-lawyer and thus is subject to rules regulating "third-party payor" situations under rules such as California Rule 3-310(F). However, since Reed Hein would be paying the attorney with its own funds, as opposed to funds provided by the specific customer, all three ethical requirements put on the attorney participating in such an arrangement are met. These

requirements are that (1) there be "no interference with the member's professional judgment or with the client-lawyer relationship," (2) confidentiality is protected and (3) the client consents in writing to the in writing to the arrangement. *See also*, Florida RPC 4-5(d), to the same effect.

52. Mr. Chinaris surmises, without citation to evidence, that the first requirement is not met because of the potential that the client might not understand the adverse consequences of a decision to attempt to exit a Wyndham timeshare. However, the very alleged adverse consequences that Mr. Chinaris speculates may not be understood are set forth in the intake documentation that each customer receives from Reed Hein. In the Reed Hein customer agreements I have reviewed, the customer expressly "acknowledges [that] during the exit process, [the customer] may incur negative credit reporting [and] foreclosure and/or legal action. . . ." In addition, such disclosures also include that debts such as mortgage debt may be required to be repaid and that any forgiveness of indebtedness may result in adverse tax consequences.

53. Mr. Chinaris next argues that "Sussman labored under an unresolved conflict of interest in concurrently in concurrently representing TET [Reed Hein] and TET's customers" in violation of California Rule 3-310(C) and Florida RPC 4-1.7(a)-(c). Both rules, however, apply only in certain specified circumstances or only in the absence of certain specified conditions. Such rules are applicable only in the instance where an "actual or reasonably foreseeable conflict of interest" is apparent (California) or a "substantial risk" of such a conflict is apparent (Florida). And even in such cases it may be waived by the client.

54. Mr. Chinaris supplies no statement of how either rule might apply to the circumstances and conditions specific to Mr. Sussman's representation of any Reed Hein customer. Indeed, he conceded during his deposition that all three of the parties (the customer, Reed Hein and Mr. Sussman) are adverse to Wyndham in the desire to effectuate the customer's exit from a Wyndham time share and thus "are aligned" in interest among themselves (Chinaris, p. 95, l. 16-p. 96, l. 11). Further, Mr. Chinaris agrees that any adversity between Reed Hein and its customers is "potential" only (Chinaris, p. 96, ll. 12-23), because of the possibility that a customer "*could have* a different view [of the outcome] based upon the advertising that went on at

[Reed Hein]" (Chinaris, p. 104, 10-p. 105-1; emphasis added). Such a "could have" possibility is not sufficient to create an actionable violation of either the California ("actual or reasonably foreseeable") or the Florida ("substantial risk") standard for discipline.[9]

55. Against these facts, it must be assumed that, if a Wyndham timeshare holder has reached the point of frustration where he or she wants to exit the arrangement and hires a service such as Reed Hein to facilitate that exit, the work of that service and any attorneys it may employ on the customer's behalf will be fully consistent with the objectives of the customer such that, at least at the outset of the relationship, any "potential" adversity is insufficient to meet the "actual" "reasonably foreseeable" or "substantial" standards to require disclosure under the rules cited by Mr. Chinaris.

56. At most, the only possible disclosure obligations that Mr. Sussman may have had under the California Rules might be under Rule 3-310(B), which provided only that disclosure, but not written consent, is required of any "legal, business, financial professional, or personal relationship with a party or witness in the same matter." As noted above, however, there are several written disclosures provided to every Reed Hein customer that explain that Reed Hein may hire any lawyer on behalf of the customer and that Reed Hein will be paying the lawyer for all requested services.

57. Finally, if any possible adversity were ever to arise, provisions in the intake documentation encourage that the customer discuss any such concerns both with outside independent counsel before signing the PoA and thereafter with the account coordinator at any time. Presumably, if such issue could not successfully be resolved, only then the attorney might have to recommend the retention of other counsel (in the event the customer already had not

---

[9] Moreover, the "potential" conflict Mr. Chinaris surmises might arise would only arise in the event that the customer and Reed Hein may disagree whether a particular exit entitled Reed Hein to its fee. However, I am informed that only a small handful of such "potential" conflicts have ever become actual with respect to any Reed Hein-Wyndham customer. And, the evidence of which I have been informed is that Mr. Sussman assisted in providing a satisfactory exit for approximately 650 of the Reed Hein-Wyndham customers to whom he provided assistance. And, in all events, Mr. Sussman was not retained to be and so far as I have been made aware has never become involved in representing either Reed Hein or one of its customers in any such dispute.

established some relationship with an independent legal counsel) depending upon the specific facts relative to such conflict.

58. In sum, there simply is no evidence that the arrangement Mr. Chinaris describes would in any way impact adversely upon the professional judgment of any of the attorneys Reed Hein may hire on behalf of its customers. Certainly, beyond theoretical possibilities, Mr. Chinaris explains no such impairment that might rise to a possible violation of California Rule 3-310(C) or Florida RPC 4-5(d) and that could not successfully be resolved or waived if it ever were to arise. Absent some possible further but as yet unsupplied facts, Mr. Sussman "labored" under nothing, at least not at the time he initially agreed to undertake the representation of any Reed Hein customer.

59. The confidentiality issue is another red herring. As explained above, Reed Hein hires the attorney on behalf of the customer pursuant to a PoA or other consent establishing expressly or by implication the agency authority for Reed Hein to do so. Once a customer hires Reed Hein, it acts as the customer's agent in obtaining the services of the attorney and the customer expressly agrees in writing to communicate with the attorney through Reed Hein (through an "Account Coordinator"). As such, Reid Hein is within the ambit of the attorney-client privilege protecting any client confidential information conveyed to or with the attorney, in California at least. Those "who are present to further the interest of the client in the consultation include a spouse, parent, business associate, joint client or any other person 'who may meet with the client and his attorney in regard to a matter of joint concern.' (Cal. Law Revision Com. com. to Evid. Code, § 952, 29B West's Ann. Evid. Code (1966 ed.) pp. 528-529; Deering's Ann. Evid. Code (1966 ed.) p. 444.)." *Benge v. Superior Court,* 131 Cal.App.3d 336, 346 (1982).[10]

[10] Parenthetically, it also must be recognized that it is by this same process that Reed Hein, and any attorney such as Mr. Sussman with whom the customer may work, also complies fully with California Rule 3-500 regarding keeping an attorney's client abreast of all "material" developments relative to the representation. In fact, it is expressly explained in writing to each Reed Hein customer that any all concerns the customer may have as to the work of the attorney may and should be addressed to the attorney through the Account Coordinator. Mr. Chinaris' only apparent disagreement with this conclusion is that "if [Reed Hein] people are stepping in and preventing that from happening, I think that's a problem" (Chinaris, p. 124, ll. 2-14). However, Mr. Chinaris cites to no evidence that any Reed Hein people ever did "prevent" the flow of information to and from Mr. Sussman or any other attorney to any Reed Hein customer and, even if they did, as noted above, Wyndham has no standing to complain on the customer's behalf.

60. I have been made aware of several orders in this matter, and others, that have addressed the issue of the attorney-client privilege with respect to the relationship of Reed Hein and the lawyers that it hires on behalf of its customers. These orders, while inconsistent with California law regarding the "necessity" requirement, are law of this case. But, in all events, they contain findings either that the information is not privileged or that the customer's choice to involve Reed Hein as a go-between between the customer and the lawyer had waived the privilege. Both of those events occurred, if at all, as a result of the nature of the communication or the choice of the customer made before any lawyer is retained on behalf of the customer. As to Mr. Sussman and the other lawyers, however, if anything, the findings in the prior discovery orders in this case establish more that the lawyers may have tried to protect too much of their communication with their clients, not that they acted in any way to compromise them.

61. At bottom, properly dissected, as any prosecuting disciplinary counsel would be required to do, the manner in which attorneys hired by Reed Hein to work on behalf of its customers, and how such attorneys are compensated, simply does not violate any rules of professional conduct applicable to such attorneys, Mr. Chinaris' theoretical suppositions and remote possibilities notwithstanding. Again, the standard for establishing such a violation requires far more than theoretical possibilities – it requires clear and convincing evidence. That standard has not been met here and I submit it cannot be met by the facts and authorities cited, or by the arguments made, by Mr. Chinaris.

62. *Inadequate Supervision*: Mr. Chinaris also opines about the supervision, or alleged lack thereof, of Reed Hein account coordinators and other employees by the outside attorney defendants of work prepared by Reed Hein employees, asserting it somehow is inherently untrustworthy. While that is not Reed Hein's issue to defend as a non-attorney participant in the customer's timeshare exit process, it remains the case that an attorney choosing to rely upon outside resources to prepare work product alone is not "inadequate supervision" in California as defined by Rule 3-110(A). A finding of a violation of the Rule requires "repeated" or "reckless" incidents of

incompetent representation of the client – including repeated incidents of inadequate supervision – and none are established by any evidence with which I have been provided here.[11]

63. It apparently will be Reed Hein's testimony that it diligently and adequately obtains all necessary information from clients who are sent to attorneys, and it will be Mr. Sussman's testimony that he has been fully satisfied with this process, finding them to be at least sufficient to fulfill his professional responsibilities. In all cases the information comes from the customer, in many cases in the customer's own handwriting. It is an attorney's duty to advocate for the client on the basis of information supplied by the client (unless the attorney knows or reasonably should know that it is demonstrably false). It is not the attorney's duty otherwise to act as the gatekeeper of such information by acting to investigate or verify it before presenting it in or in anticipation of any litigated matter. And, so far as I have been made aware, no Reed Hein customer has complained that the Reed Hein representatives who facilitate the communications between Reed Hein customers and the lawyers involved is in any way inadequate, certainly any complaints that have not been resolved to the satisfaction of the customer.

64. Also, the facts presented here are that any truly legal work product is reviewed or signed by the attorney in question before it is provided to or used by any Reed Hein customer. That fact alone establishes a sufficient basis for Reed Hein to be confident that adequate supervision of the content of the work product is present with regard to its customers. As to any other non-legal work product that may be contained in what the attorney prepares, there is no evidence of which I have been made aware that any such information as presented on behalf of any customer in any final work product of any attorney to any developer such as Wyndham was either incorrect or misleading, let alone being repeatedly or recklessly incompetently prepared.

[11] Indeed, it must be presumed from Mr. Sussman's record of successfully assisting approximately 1300 time share customers to exit from their Wyndham time share obligations, including approximately half of them being Reed Hein customers, Mr. Sussman was doing his work in a competent fashion for his clients – however unpleasant the outcomes may have been for his adversary, Wyndham. Certainly, Mr. Chinaris offered no evidence that Mr. Sussman's alleged "lack of control" over Reed Hein customer representatives ever had any impact upon any Reed Hein customer (Chinaris, p. 135, ll. 4-9). Rather, Mr. Chinaris stated he knew of no Reed Hein customer who ever failed to get a requested update from Mr. Sussman (Chinaris, p. 14, ll. 7-23).

65. Finally, the mere theoretical possibility alone that there could be some breakdown in the path of travel of information between the client and the attorney through any intermediary establishes nothing. As noted, a violation of Rule 3-110(A) requires a showing of either repeated or reckless conduct resulting in the incompetent representation of any client, and there is no such evidence presented here of which I am aware. Again, with 1300 successful outcomes of his matters adverse to Wyndham (including approximately half representing Reed Hein customers), it must be presumed that Mr. Sussman's professed assessment that he was getting all the information he needed from Reed Hein from its customers more than adequately attests to the competency of the information gathering upon which Mr. Sussman relied as to Reed Hein customers.

66. And, what standing Wyndham may have to complain about how the defendant attorneys may deal with or supervise the Reed Hein client representatives simply has not been established in all events.

67. *Advertising*: Mr. Chinaris makes a number of assertions regarding Reed Hein's advertising, all of which seem to be based upon Reed Hein's alleged violation of rules regarding advertising by an attorney. As noted above, however, Reed Hein is not acting as an attorney and thus is not bound by rules directed exclusively to attorney advertising, whatever effect the advertisements may have upon attorneys such as Mr. Sussman.

68. Moreover, Mr. Chinaris' criticisms regarding advertising based upon the rules of professional conduct relative to attorneys generally simply miss the point. The purpose of those rules is to protect the consumers of the attorneys' services, not the potential adversaries of the consumers who may choose to or are counseled by attorneys hired by Reed Hein on behalf of its customers.

69. Also, Mr. Chinaris' opinions in regard to advertising lack specificity. He fails to explain just how any Reed Hein advertising may be "materially misleading, if not false . . . ." Nor does he cite to any specific examples of the text of the allegedly offending advertising.

70. As to the few general examples Mr. Chinaris does give of alleged "misleading advertising," his claims are incorrect. Reed Hein does inform its customers that they may be

referred to a lawyer. Also, the fact that no specific lawyer is named in the advertisement – but rather that Reed Hein will hire an appropriate lawyer based upon what needs the customer may have – simply is further proof that Reed Hein's role as to the hiring of an attorney is as an agent for the benefit of the customer and not an act of any lawyer or an act for the benefit of any specific independent lawyer.

71. Finally, Reed Hein advertising about unnamed or unspecified attorneys is not advertising by any specific attorney (any "member") subject to disciplinary regulation. Clearly, in the case of Mr. Sussman personally, such advertising referring to the possible hiring of some unnamed attorney is just as likely to be advertising that results in a benefit not to Mr. Sussman, but to one of his competitors.

72. *Further Assignments*: I have no specific further assignments pending at this time. However, I anticipate that I may be deposed or be required to testify at trial, that additional issues may arise in the course of further proceedings and that I may be called upon to research one or more of such additional questions or issues. As to all such possible work, I reserve the right to do such work as retaining counsel may request and the Court may permit, and to revise or amend this Rebuttal Report accordingly.

## **Conclusion**

73. For all of the foregoing reasons, it is my opinion that Mr. Chinaris' Report and subsequent testimony fails to establish any of the claims Wyndham is making against Reed Hein, whether based upon Reed Hein's singular conduct or based derivatively upon Mr. Sussman's conduct.

74. In fact, in my 48 years of being an attorney and in my 35 years being heavily involved in attorney ethics and attorneys' fees issues specifically, I have never heard of what Mr. Chinaris describes to have been found to be either UPL, a form of unethical fee splitting or false advertising. The closest analogy I can think of is an insurer. It is correct that the insurance industry is a highly regulated industry and that, when it comes to the lawyers insurers provide to their

insureds, there are many differences. But, as to an insurer's relationship with the attorneys, I believe the analogy is apt. Insurers provide to insureds a service for which an insurer charges its customers monthly or yearly premiums. The insurer advertises that, in the event that an insured is sued over a covered claim, the insurer will legally provide and pay for an attorney to handle the matter. No specific attorney is named in any of its advertising. The insurer pays the attorney out of its general income stream derived from the fees – premiums – paid by its insureds and out of its other income streams. To my knowledge no insurer that does these things has ever been found to be engaged in UPL, unethical fee splitting or false advertising.

75. In the case of Reed Hein, it essentially relates to lawyers in the same way as an insurer does to attorneys that it hires for its customers. It advertises a certain service and explains that, if the service may require the services of an attorney, Reed Hein will provide and pay for one. Reed Hein pays for the attorney's services out of its general income stream in the same manner as an insurer will. Thus, what Reed Hein does in terms of hiring an attorney for its customers is indistinguishable from what an insurer does. Unless there is some regulation applicable in Florida specific to timeshare exit companies of which I may not be aware, for Reed Hein to hire counsel when necessary to perform some of the company's contractual obligations is not UPL. To pay for an attorney for a customer out of Reed Hein's general income streams to perform the required services is not unethical fee splitting. And what Reed Hein does to advertise that it may be hiring an unnamed attorney for its customers whose cases require one is not false advertising.

Executed this 15th day of March, 2021, at Palm Desert, California.

By: ______________________
JOEL MARK